**McKISSICK et al. v. CARMICHAEL et al.**
**No. 6201.**

United States Court of Appeals
Fourth Circuit.

Argued March 15, 1951.

Decided March 27, 1951.

As Modified June 15, 1951.

---

Robert L. Carter and Thurgood Marshall, New York City (Conrad O. Pearson, Durham, N. C., on the brief), for appellants.

Harry McMullan, Atty. Gen. of North Carolina, and L. P. McLendon, Greensboro, N. C. (Ralph Moody, Asst. Atty. Gen., W. F. Brinkley, Atty. Gen.'s Office, Raleigh, N. C., W. B. Umstead, Durham, N. C., and J. C. B. Ehringhaus, Jr., Raleigh, N. C., on the brief), for appellees.

Before SOPER and DOBIE, Circuit Judges, and WATKINS, District Judge.

SOPER, Circuit Judge.

The applications of four qualified Negro students, citizens of North Carolina, for admission to the School of Law of the University of North Carolina were rejected solely on account of their race and color by the school authorities; and this suit was brought against the President of the University, the Dean of the Law School and others, denouncing their action as a violation of the Equal Protection Clause of the 14th Amendment, and praying an injunction to prohibit them from denying the plaintiffs admission. The defense was made that the State of North Carolina had established the North Carolina College for Negroes at Durham, North Carolina, and in connection therewith a Law School for Negroes, which affords a legal education substantially equivalent to that which the Negro plaintiffs would receive if admitted to the Law School of the University. The District Judge sustained this defense and dismissed the complaint. Our examination of the undisputed facts of the case convinces us that the Negro School is clearly inferior to the white, and that the judgment must therefore be reversed in accordance with the decision in Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114, which was rendered prior to the trial of the pending case in the District Court.

The University of North Carolina is now holding its 157th session. In 1843 a professor of law was appointed, and in subsequent years the degree of Bachelor of Laws was conferred in a few cases. A School of Law was formally established and the first Dean was appointed in 1899. It now has a faculty of ten members, consisting of a Dean and nine others. Of these, nine are full professors and one is an assistant professor. All received an academic education at recognized colleges or universities and legal training at law schools of high grade. All have had considerable experience in teaching law in North Carolina and elsewhere, one for ten years and the rest between ten and twenty years. The salaries paid the full professors range from $6740 to $8500 per annum; the salary of the assistant professor is $4500.

Members of the faculty serve in an advisory capacity on legislative commissions of the State; one of them is Director of the Institute of Government, which is a part of the University; and from time to time members of the staff of the Institute are invited to discuss problems of government in the classes of the Law School.

The members of the Faculty have shown scholarly capacity in writing legal articles contributed by them to the North Carolina Law Review, which has been issued since 1923, and to the Law Reviews published by other law schools of good standing. The North Carolina Law Review is published by the University of North Carolina Press, under the management of the faculty of the Law School. It serves as a medium of scholarship, working toward the improvement of the law; and it also serves as a factor in the legal training of the abler students who, by reason of their facility of expression and their ability to make the necessary research, are deemed qualified to make contributions to the publication. Those who are chosen for this purpose have the opportunity to cooperate and engage in discussion in the preparation of the articles for publication and thereby receive training and experience of consider-

able educational value. Colored students of the Colored Law School do not share in this opportunity. They are allowed to contribute and two or three have done so in the past, but none since the last war.

The University Law School, its faculty and its Law Review, enjoy a fine reputation in legal circles in the United States. The school is accredited by the North Carolina Board of Law Examiners, the American Bar Association and the Association of American Law Schools.

The North Carolina College at Durham was founded as a religious training school for Negroes in 1910. It met with financial difficulties and in 1915 was sold and organized as The National Training School, which was supported by private philanthropy for some years. In 1923 it was acquired by the State and became the Durham State Normal College, and was maintained as a training school for Negro high school teachers. In 1925 it was converted into a liberal arts college and given its present name. The law school was added in 1939 after the decision of the Supreme Court of the United States on December 12, 1938 in State of Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L. Ed. 208, under which the University of Missouri was required to accept a Negro law student because the State did not furnish legal education in the University provided by it for students of his race. Only one Negro student appeared in the North Carolina School of Law in 1939 and it was closed; but it was reopened in 1940 and has since been continuously operated.

The faculty of the Law School now consists of five full time professors, including the Dean, and in addition, two visiting professors, one from the University of North Carolina and one from Duke University, each of whom gives three hours weekly to the work. The former teaches the same property courses which he gives at the University of North Carolina, and the latter gives a course in Practice. The full time men have received collegiate degrees from universities and colleges, and also the degree of Bachelor of Laws from recognized law schools. The Dean is the only full professor, while all the other full time men are ranked as assistant professors. The salary range includes two teachers at $4600, two at $5040, and one at $7,000 per annum.

Their experience in teaching law is limited to their present work at the College Law School, in which the Dean has taught since 1941, two of them for three years, one for one year and one is a new man on the faculty.

The members of the faculty have had no opportunity to study legislative problems in connection with the Institute of Government at the University, or as advisers to members of the State Legislature on Legislative Commissions.

No member of the faculty has contributed to the North Carolina Law Review or published any legal writing. No law review is maintained or published by the Law School, and no training in this respect is offered to the students.

The Law School and its faculty have achieved no reputation in legal circles. The school is accredited by the North Carolina Board of Law Examiners and by the American Bar Association, and membership is expected in the Association of American Law Schools to which an application has been made.

These undisputed facts furnish abundant support for the opinion freely expressed by witnesses of outstanding experience and eminence in the law school field that the faculty of the University is superior to that of the College Law School. Most of the witnesses for the defendant as well as the Deans of the two law schools and the President of the North Carolina College for Negroes did not venture the opinion that the faculties were of equal quality.

The major subjects of legal education are taught at both schools. The College lists twenty-seven courses in its catalogue. The University lists the same courses and in addition separate courses in brief making, damages, debtors' assets, federal jurisdiction, future interests, government regulation of business, legislation, municipal

corporations, jurisprudence, taxation (2), unfair trade practice and Wage and Hour law. The District Judge found that "the subject matter taught in some of the courses listed in the University catalog and not listed in the College catalog, is taught under other course names at the College. * * * For instance, a course is offered at the University under the name of damages and no comparable course is offered at the College as such, but the subject matter included in this course is covered in the courses of contracts and torts at the College. * * * There is no evidence that any of the subject matter taught in courses not listed in the College catalog is not so taught."

It seems quite clear, however, that certain courses, such as federal jurisdiction, which are separately taught at the University, could not be adequately treated as incidental to any other course; but it is more important that the members of the smaller faculty at the College are obliged to teach a greater variety of subjects than the professors at the University, and therefore are less able to increase their efficiency and their command of the subjects entrusted to them.

The quality and character of any school depends in large measure upon the quality and character of its students; hence a comparison of the student bodies of the two schools throws a strong light on the question at issue. The University Law School has 280 students, who, in their point of origin and in their previous training and economic and social status, represent a cross section of the white people of the State who constitute 74 per cent. of its population. From this society the colored law students, who number only 28, are excluded. We hardly need the testimony of the experienced and qualified law school men, which the record contains, to realize that this act deprives the minority of educational advantages which their contemporaries enjoy. It has been said that the heart of legal education is found in discussion with one's associates. The case system, which is used at both schools, is designed to compel the student to think for himself and to discover the legal principles underlying the decisions and to this end, to engage in discussion with his fellows in and out of the class room. It goes without saying that if he is exposed to the competition of minds of diverse types his mental processes will be stimulated and his outlook will be broadened.

The practice of law is indeed a highly competitive occupation which involves the relations of men to one another; and it is imperative that a student, who is taking the first steps in his life work, shall learn as soon as possible the complexities of human nature and the influences which govern it. Moreover, it is of specific value that the students form acquaintance with the persons who will later occupy positions of influence and power in the profession and in the public life of the State. In North Carolina, as elsewhere, the leaders in many activities have graduated from one or another of the leading law schools of the State. To know and to be known by the dominant figures of the commonwealth facilitates private as well as public business, and as the colored population grows in experience in public affairs and in economic importance, the business relations of the race and of their legal advisers will increasingly expand. It is a definite handicap to the colored student to confine his association in the law school to people of his own class. In the Negro School, the handicap is heightened by the small size of the classes which average only eight or nine students, too small for efficient work in any event, and yet larger than would probably be the case if the government assistance to war veterans should be withdrawn.[1]

1. The number of students of the University Law School prior to the last war was about 125, less than one-half of the present number of 280, of whom 80 per cent. are veterans. The pre-war population of the College Law School is not stated in the record.

There are other material inequalities between the schools but they are of less importance than those above described and in some respects they are on the mend. The University School occupies a superior building, which is now in process of enlargement, to accommodate the large increase in students; but the College Law School, which is now in inferior quarters, will be presently moved to a remodeled building now used as the general library of the College, and the new quarters seem to be ample for the Law School's needs.

The law library of the University contains 64,000 volumes, of which only 22,000 are now available, since 42,000 are in storage pending the completion of the new building. The library also contains 300 law reviews and periodicals, of which 108 are in complete sets. The College library contains 30,000 volumes of which 7,000 are in storage pending the completion of its new building. It receives the current numbers of 26 to 28 of the best law reviews and periodicals. The University maintains a summer law school but the College does not.

In answer to this demonstration that Negro law students are deprived of equal treatment by the State, the defendants in the trial below stressed certain features of the Negro School and certain limitations in the practice which as Negro lawyers the students may reasonably expect after graduation, and led the court to conclude that "such disparities as do exist are either overcome or equalized by advantages which the plaintiffs would enjoy at the College Law School." Especially was it emphasized that the faculty, the library, the curriculum and the physical plant of the College Law School are sufficient to have won the approval of standard accrediting authorities, and that the legal training afforded is sufficient for the practical purposes of enabling the students to pass the bar examinations, as the evidence shows, and thereafter to practice law. There was evidence to support these contentions and the court made the finding that the School was adequate for these purposes.

Attention was also called to the fixed and continued purpose of the State of North Carolina to establish and build up separate institutions for the higher education of Negroes, as evidenced by the acquisition of the North Carolina College in 1925 and its growth from 100 to 1300 students at the present time, and by the establishment of the Law School in 1939, after the decision in the Gaines case, without suit or threat of suit by any applicant. It is pointed out that North Carolina is spending $1460 per annum to support each student in its colored law school and only $416 per student per annum in its white law school; and it is suggested that the intelligent and broad-minded people of both races should be intensely interested in the course of action that will be best for all, and that the destruction of the Law School would deprive colored lawyers of their only chance of teaching law in North Carolina, and would retard the influence and prestige of the College.

Many of defendants' experienced witnesses were of the opinion that the teaching is more effective in the colored than in the white school because of the respective size of the classes. In the University School the classes range from 80 to 116, a number entirely too large for efficient instruction, 25 was said to be the ideal number, whereas the classes in the College School are composed of 8 or 9 individuals, too small for the best results, but of such size as to permit individual instruction of each student; and it is said that this circumstance alone compensates for the deficiency in the colored school. Moreover, it is shown that colored lawyers are rarely if ever employed by white persons in North Carolina, and hence it is argued that the success of the colored graduates in active practice would be promoted far more by association and acquaintance formed with the 1300 students of the North Carolina College than by mingling with the white students at the University.

These circumstances are worthy of consideration by any one who is responsible for the solution of a difficult racial problem; but they do not meet the complainants' case or overcome the deficiencies which it discloses. Indeed the defense seeks in part to avoid the charge of in-

954

equality by the paternal suggestion that it would be beneficial to the colored race in North Carolina as a whole, and to the individual plaintiffs in particular, if they would cooperate in promoting the policy adopted by the State rather than seek the best legal education which the State provides. The duty of the federal courts, however, is clear. We must give first place to the rights of the individual citizen, and when and where he seeks only equality of treatment before the law, his suit must prevail. It is for him to decide in which direction his advantage lies.

The present case on its merits is not open to reasonable doubt. The earnest effort put forth by the State to provide higher education for Negroes serves to emphasize the great difficulty and expense involved in establishing equivalent schools in the higher reaches of the educational field rather than to show substantial equality in the present instance. The situation differs in circumstance but not in principle from the decision in Sweatt v. Painter, 339 U.S. 629, at pages 633, 634, 70 S.Ct. 848, at page 850, 94 L.Ed. 1114, which in the following passage, describes the insufficiency of the separate law school set up for colored students by the State of Texas:

" * * * In terms of number of the faculty, variety of courses and opportunity for specialization, size of the student body, scope of the library, availability of law review and similar activities, the University of Texas Law School is superior. What is more important, the University of Texas Law School possesses to a far greater degree those qualities which are incapable of objective measurement but which make for greatness in a law school. Such qualities, to name but a few, include reputation of the faculty, experience of the administration, position and influence of the alumni, standing in the community, traditions and prestige. It is difficult to believe that one who had a free choice between these law schools would consider the question close.

"Moreover, although the law is a highly learned profession, we are well aware that it is an intensely practical one. The law

school, the proving ground for legal learning and practice, cannot be effective in isolation from the individuals and institutions with which the law interacts. Few students and no one who has practiced law would choose to study in an academic vacuum, removed from the interplay of ideas and the exchange of views with which the law is concerned. The law school to which Texas is willing to admit petitioner excludes from its student body members of the racial groups which number 85% of the population of the State and include most of the lawyers, witnesses, jurors, judges and other officials with whom petitioner will inevitably be dealing when he becomes a member of the Texas Bar. With such a substantial and significant segment of society excluded, we cannot conclude that the education offered petitioner is substantially equal to that which he would receive if admitted to the University of Texas Law School."

The judgment must be reversed and the case remanded for further proceedings so that the relief prayed may be granted by the District Court.

Reversed and remanded.