**BRIGGS et al. v. ELLIOTT et al.**

**Civ. A. No. 2657.**

United States District Court
E. D. South Carolina, Charleston Division.

Heard May 28, 1951.

Decided June 23, 1951.

Waring, J., dissented.

✓ Thurgood Marshall, Robert L. Carter, New York City, Harold R. Boulware, Columbia, S. C., Spottswood W. Robinson, III, Richmond, Va., Arthur Shores, Birmingham, Ala., A. T. Walden, Atlanta, Ga., for plaintiffs.

T. C. Callison Atty. Gen., of South Carolina, Robert McC. Figg, Jr., Charleston, S. C., S. E. Rogers, Summerton, S. C., for defendants.

Before PARKER, Circuit Judge, and WARING and TIMMERMAN, District Judges.

PARKER, Circuit Judge.

This is a suit for a declaratory judgment and injunctive relief in which it is alleged that the schools and educational facilities provided for Negro children in School District No. 22 in Clarendon County, South Carolina, are inferior to those provided for white children in that district and that this amounts to a denial of the equal protection of the laws guaranteed them by the Fourteenth Amendment to the Federal Constitution, and further that the segregation of Negro and white children in the public schools, required by Article 11, section 7 of the Constitution of South Carolina and section 5377 of the Code of Laws of that state,[1] is of itself violative of the equal protection clause of the Fourteenth Amendment. Plaintiffs are Negro children of school age who are entitled to attend

1. Article 11, section 7 of the Constitution of South Carolina is as follows: "Separate schools shall be provided for children of the white and colored races, and no child of either race shall ever be permitted to attend a school provided for children of the other race."

Section 5377 of the Code of Laws of South Carolina of 1942 is as follows: "It shall be unlawful for pupils of one race to attend the schools provided by boards of trustees for persons of another race."

the public schools in District No. 22 in Clarendon County, their parents and guardians. Defendants are the school officials who, as officers of the state, have control of the schools in the district. A court of three judges has been convened pursuant to the provisions of 28 U.S.C. §§ 2281 and 2284, the evidence offered by the parties has been heard and the case has been submitted upon the briefs and arguments of counsel. ·

At the beginning of the hearing the defendants admitted upon the record that "the educational facilities, equipment, curricula and opportunities afforded in School District No. 22 for colored pupils * * * are not substantially equal to those afforded for white pupils". The evidence offered in the case fully sustains this admission. The defendants contend, however, that the district is one of the rural school districts which has not kept pace with urban districts in providing educational facilities for the children of either race, and that the inequalities have resulted from limited resources and from the disposition of the school officials to spend the limited funds available "for the most immediate demands rather than in the light of the overall picture". They state that under the leadership of Governor Byrnes the Legislature of South Carolina has made provision for a bond issue of $75,-000,000 with a three per cent sales tax to support it for the purpose of equalizing educational opportunities and facilities throughout the state and of meeting the problem of providing equal educational opportunities for Negro children where this had not been done. They have offered evidence to show that this educational program is going forward and that under it the educational facilities in the district will be greatly improved for both races and that Negro children will be afforded educational facilities and opportunities in all respects equal to those afforded white children.

There can be no question but that where separate schools are maintained for Negroes and whites, the educational facilities and opportunities afforded by them must be equal. The state may not deny to any person within its jurisdiction the equal protection of the laws, says the Fourteenth Amendment; and this means that, when the state undertakes public education, it may not discriminate against any individual on account of race but must offer equal opportunity to all. As said by Chief Justice Hughes in Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 349, 59 S.Ct. 232, 236, 83 L.Ed. 208. "The admissibility of laws separating the races in the enjoyment of privileges afforded by the State rests wholly upon the equality of the privileges which the laws give to the separated groups within the State." See also Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114; Corbin v. County School Board of Pulaski County, 4 Cir., 177 F.2d 924; Carter v. School Board of Arlington County, Va., 4 Cir., 182 F.2d 531; McKissick v. Carmichael, 4 Cir., 187 F.2d 949. We think it clear, therefore, that plaintiffs are entitled to a declaration to the effect that the school facilities now afforded Negro children in District No. 22 are not equal to the facilities afforded white children in the district and to a mandatory injunction requiring that equal facilities be afforded them. How this shall be done is a matter for the school authorities and not for the court, so long as it is done in good faith and equality of facilities is afforded; but it must be done promptly and the court in addition to issuing an injunction to that effect will retain the cause upon its docket for further orders and will require that defendants file within six months a report showing the action that has been taken by them to carry out the order.

Plaintiffs ask that, in addition to granting them relief on account of the inferiority of the educational facilities furnished them, we hold that segregation of the races in the public schools, as required by the Constitution and statutes of South Carolina, is of itself a denial of the equal protection of the laws guaranteed by the Fourteenth Amendment, and that we enjoin the enforcement of the constitutional provision and statute requiring it and by our injunction require defendants to admit Negroes to schools to which white students

are admitted within the district. We think, however, that segregation of the races in the public schools, so long as equality of rights is preserved, is a matter of legislative policy for the several states, with which the federal courts are powerless to interfere.

One of the great virtues of our constitutional system is that, while the federal government protects the fundamental rights of the individual, it leaves to the several states the solution of local problems. In a country with a great expanse of territory with peoples of widely differing customs and ideas, local self government in local matters is essential to the peace and happiness of the people in the several communities as well as to the strength and unity of the country as a whole. It is universally held, therefore, that each state shall determine for itself, subject to the observance of the fundamental rights and liberties guaranteed by the federal Constitution, how it shall exercise the police power, i. e. the power to legislate with respect to the safety, morals, health and general welfare. And in no field is this right of the several states more clearly recognized than in that of public education. As was well said by Mr. Justice Harlan, speaking for a unanimous court in Cumming v. County Board of Education, 175 U.S. 528, 545, 20 S.Ct. 197, 201, 44 L.Ed. 262, "while all admit that the benefits and burdens of public taxation must be shared by citizens without discrimination against any class on account of their race, the education of the people in schools maintained by state taxation is a matter belonging to the respective states, and any interference on the part of Federal authority with the management of such schools cannot be justified except in the case of a clear and unmistakable disregard of rights secured by the supreme law of the land."

It is equally well settled that there is no denial of the equal protection of the laws in segregating children in the schools for purposes of education, if the children of the different races are given equal facilities and opportunities. The leading case on the subject in the Supreme Court is Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 1140, 41 L.Ed. 256, which involved segregation in railroad trains, but in which the segregation there involved was referred to as being governed by the same principle as segregation in the schools. In that case the Court said: "The object of the amendment was undoubtedly to enforce the absolute equality of the two races before the law, but, in the nature of things, it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation, in places where they are liable to be brought into contact, do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for white and colored children, which has been held to be a valid exercise of the legislative power even by courts of states where the political rights of the colored race have been longest and most earnestly enforced."

Later in the opinion the Court said: "So far, then, as a conflict with the fourteenth amendment is concerned, the case reduces itself to the question whether the statute of Louisiana is a reasonable regulation, and with respect to this there must necessarily be a large discretion on the part of the legislature. *In determining the question of reasonableness, it is at liberty to act with reference to the established usages, customs, and traditions of the people, and with a view to the promotion of their comfort, and the preservation of the public peace and good order."* (Italics supplied.)

Directly in point and absolutely controlling upon us so long as it stands unreversed by the Supreme Court is Gong Lum v. Rice, 275 U.S. 78, 48 S.Ct. 91, 93, 72 L.Ed. 172, in which the complaint was that a child of Chinese parentage was excluded from a school maintained for white children under a segregation law and was permitted to enter only a school maintained for colored children. Although attempt is made to dis-

tinguish this case, it cannot be distinguished. The question as to the validity of segregation in the public schools on the ground of race was squarely raised, the Fourteenth Amendment was relied upon as forbidding segregation and the issue was squarely met by the Court. What was said by Chief Justice Taft speaking for a unanimous court, is determinative of the question before us. Said he:

"The case then reduces itself to the question whether a state can be said to afford to a child of Chinese ancestry, born in this country and a citizen of the United States, the equal protection of the laws, by giving her the opportunity for a common school education in a school which receives only colored children of the brown, yellow or black races.

"The right and power of the state to regulate the method of providing for the education of its youth at public expense is clear. * * *

"The question here is whether a Chinese citizen of the United States is denied equal protection of the laws when he is classed among the colored races and furnished facilities for education equal to that offered to all, whether white, brown, yellow, or black. Were this a new question, it would call for very full argument and consideration; but we think that it is the same question which has been many times decided to be within the constitutional power of the state Legislature to settle, without intervention of the federal courts under the federal Constitution. Roberts v. City of Boston, 5 Cush. (Mass.) 198, 206, 208, 209; State ex rel. Garnes v. McCann, 21 Ohio St. 198, 210; People ex rel. King v. Gallagher, 93 N.Y. 438; People ex rel. Cisco v. School Board, 161 N.Y. 598, 56 N.E. 81, 48 L.R.A. 113; Ward v. Flood, 48 Cal. 36; Wysinger v. Crookshank, 82 Cal. 588, 590, 23 P. 54; Reynolds v. Board of Education, 66 Kan. 672, 72 P. 274; McMillan v. School Committee, 107 N.C. 609, 12 S.E. 330, 10 L.R.A. 823; Cory v. Carter, 48 Ind. 327; Lehew v. Brummell, 103 Mo. 546, 15 S.W. 765, 11 L.R.A. 828; Dameron v. Bayless, 14 Ariz. 180, 126 P. 273; State ex rel. Stoutmeyer v. Duffy, 7 Nev. 342, 348, 355; Bertonneau v. Board, 3 Woods 177,

3 Fed.Cas. 294, [Case] No. 1,361; United States v. Buntin (C.C.), 10 F. 730, 735; Wong Him v. Callahan (C.C.), 119 F. 381.

"In Plessy v. Ferguson, 163 U.S. 537, 544, 545, 16 S.Ct. 1138, 1140, 41 L.Ed. 256, in upholding the validity under the Fourteenth Amendment of a statute of Louisiana requiring the separation of the white and colored races in railway coaches, *a more difficult question than this,* this court, speaking of permitted race separation, said:

" 'The most common instance of this is connected with the establishment of separate schools for white and colored children, which has been held to be a valid exercise of the legislative power even by courts of states where the political rights of the colored race have been longest and most earnestly enforced.'

    *    \*    \*    \*    \*    \*

"Most of the cases cited arose, it is true, over the establishment of separate schools as between white pupils and black pupils; but we cannot think that the question is any different, or that any different result can be reached, assuming the cases above cited to be rightly decided, where the issue is as between white pupils and the pupils of the yellow races. *The decision is within the discretion of the state in regulating its public schools, and does not conflict with the Fourteenth Amendment.*" (Italics supplied.)

Only a little over a year ago, the question was before the Court of Appeals of the District of Columbia in Carr v. Corning, 86 U.S.App.D.C. 173, 182 F.2d 14, 16, a case involving the validity of segregation within the District, and the whole matter was exhaustively explored in the light of history and the pertinent decisions in an able opinion by Judge Prettyman, who said:

"It is urged that the separation of the races is itself, apart from equality or inequality of treatment, forbidden by the Constitution. The question thus posed is whether the Constitution lifted this problem out of the hands of all legislatures and settled it. We do not think it did. Since the beginning of human history, no circumstance has given rise to more difficult and delicate problems than has the coexist-

ence of different races in the same area. Centuries of bitter experience in all parts of the world have proved that the problem is insoluble by force of any sort. The same history shows that it is soluble by the patient processes of community experience. Such problems lie naturally in the field of legislation, a method susceptible of experimentation, of development, of adjustment to the current necessities in a variety of community circumstance. We do not believe that the makers of the first ten Amendments in 1789 or of the Fourteenth Amendment in 1866 meant to foreclose legislative treatment of the problem in this country.

"This is not to decry efforts to reach that state of common existence which is the obvious highest good in our concept of civilization. It is merely to say that the social and economic interrelationship of two races living together is a legislative problem, as yet not solved, and is not a problem solved fully, finally and unequivocally by a fiat enacted many years ago. We must remember that on this particular point we are interpreting a constitution and not enacting a statute.

"We are not unmindful of the debates which occurred in Congress relative to the Civil Rights Act of April 9, 1866, the Fourteenth Amendment, and the Civil Rights Act of March 1, 1875. But the actions of Congress, the discussion in the Civil Rights cases, and the fact that in 1862, 1864, 1866 and 1874 Congress, as we shall point out in a moment, enacted legislation which specifically provided for separation of the races in the schools of the District of Columbia, conclusively support our view of the Amendment and its effect.

"The Supreme Court has consistently held that if there be an 'equality of the privileges which the laws give to the separated groups', the races may be separated. That is to say that constitutional invalidity does not arise from the mere fact of separation but may arise from an inequality of treatment. Other courts have long held to the same effect."

It should be borne in mind that in the above cases the courts have not been dealing with hypothetical situations or mere theory, but with situations which have actually developed in the relationship of the races throughout the country. Segregation of the races in the public schools has not been confined to South Carolina or even to the South but prevails in many other states where Negroes are present in large numbers. Even when not required by law, it is customary in many places. Congress has provided for it by federal statute in the District of Columbia; and seventeen of the states have statutes or constitutional provisions requiring it. They are Alabama, Arkansas, Delaware, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, Missouri, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, and West Virginia.[2] And the validity of legislatively requiring segregation in the schools has been upheld wherever the question has been raised. See Wong Him v. Callahan, C. C., 119 F. 381; United States v. Buntin, C.C., 10 F. 730; Bertonneau v. Board of Directors, 3 Fed.Cas. 294, No. 1,361; Dameron v. Bayless, 14 Ariz. 180, 126 P. 273; Maddox v. Neal, 45 Ark. 121, 55 Am.Rep. 540; Ward v. Flood, 48 Cal. 36, 17 Am. Rep. 405; Cory v. Carter, 48 Ind. 327, 17 Am.Rep. 738; Graham v. Board of Education, 153 Kan. 840, 114 P.2d 313; Richardson v. Board of Education, 72 Kan. 629, 84 P. 538; Reynolds v. Board of Education, 66 Kan. 672, 72 P. 274; Chrisman v. Mayor of City of Brookhaven, 70 Miss. 477, 12 So. 458; Lehew v. Brummell, 103 Mo. 546, 15 S.W. 765, 11 L.R.A. 828, 23 Am.St.Rep. 895; State ex rel. Stoutmeyer v. Duffy, 7 Nev. 342, 8 Am.Rep. 713; People ex rel. Cisco v. School Board, 161 N.Y. 598, 56 N.E. 81, 48 L.R.A. 113; People v. Gallagher, 93 N.Y. 438, 45 Am.Rep. 232; McMillan v. School Committee, 107 N.C. 609, 12 S.E. 330, 10 L.R.A. 823; State ex rel. Garnes v. McCann, 21 Ohio St. 198; Board of

2. Statistical Summary of Education, 1947–48, "Biennial Survey of Education in the United States, 1946–48", ch. 1, pp. 8, 40

(Federal Security Agency, Office of Education).

Education v. Board of Com'rs, 14 Okl. 322, 78 P. 455; Martin v. Board of Education, 42 W.Va. 514, 26 S.E. 348.[3] No cases have been cited to us holding that such legislation is violative of the Fourteenth Amendment. We know of none, and diligent search of the authorities has failed to reveal any.

Plaintiffs rely upon expressions contained in opinions relating to professional education such as Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114, McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149, and McKissick v. Carmichael, 4 Cir., 187 F.2d 949, where equality of opportunity was not afforded. Sweatt v. Painter, however, instead of helping them, emphasizes that the separate but equal doctrine of Plessy v. Ferguson, has not been overruled, since the Supreme Court, although urged to overrule it, expressly refused to do so and based its decision on the ground that the educational facilities offered Negro law students in that case were not equal to those offered white students. The decision in McKissick v. Carmichael, was based upon the same ground. The case of McLaurin v. Oklahoma State Regents, involved humiliating and embarrassing treatment of a Negro graduate student to which no one should have been required to submit. Nothing of the sort is involved here.

The problem of segregation as applied to graduate and professional education is essentially different from that involved in segregation in education at the lower levels. In the graduate and professional schools the problem is one of affording equal educational facilities to persons sui juris and of mature personality. Because of the great expense of such education and the importance of the professional contacts established while carrying on the educational process, it is difficult for the state to maintain segregated schools for Negroes in this field which will afford them opportunities for education and professional advancement equal to those afforded by the graduate and professional schools main-

tained for white persons. What the courts have said, and all they have said in the cases upon which plaintiffs rely is that, notwithstanding these difficulties, the opportunity afforded the Negro student must be equal to that afforded the white student and that the schools established for furnishing this instruction to white persons must be opened to Negroes if this is necessary to give them the equal opportunity which the Constitution requires.

The problem of segregation at the common school level is a very different one. At this level, as good education can be afforded in Negro schools as in white schools and the thought of establishing professional contacts does not enter into the picture. Moreover, education at this level is not a matter of voluntary choice on the part of the student but of compulsion by the state. The student is taken from the control of the family during school hours by compulsion of law and placed in control of the school, where he must associate with his fellow students. The law thus provides that the school shall supplement the work of the parent in the training of the child and in doing so it is entering a delicate field and one fraught with tensions and difficulties. In formulating educational policy at the common school level, therefore, the law must take account, not merely of the matter of affording instruction to the student, but also of the wishes of the parent as to the upbringing of the child and his associates in the formative period of childhood and adolescence. If public education is to have the support of the people through their legislatures, it must not go contrary to what they deem for the best interests of their children.

There is testimony to the effect that mixed schools will give better education and a better understanding of the community in which the child is to live than segregated schools. There is testimony, on the other hand, that mixed schools will result in racial friction and tension and that the only practical way of conducting

3. See also Roberts v. City of Boston, 5 Cush., Mass., 198, decided prior to the Fourteenth Amendment.

public education in South Carolina is with segregated schools. The questions thus presented are not questions of constitutional right but of legislative policy, which must be formulated, not in vacuo or with doctrinaire disregard of existing conditions, but in realistic approach to the situations to which it is to be applied. In some states, the legislatures may well decide that segregation in public schools should be abolished, in others that it should be maintained—all depending upon the relationships existing between the races and the tensions likely to be produced by an attempt to educate the children of the two races together in the same schools. The federal courts would be going far outside their constitutional function were they to attempt to prescribe educational policies for the states in such matters, however desirable such policies might be in the opinion of some sociologists or educators. For the federal courts to do so would result, not only in interference with local affairs by an agency of the federal government, but also in the substitution of the judicial for the legislative process in what is essentially a legislative matter.

The public schools are facilities provided and paid for by the states. The state's regulation of the facilities which it furnishes is not to be interfered with unless constitutional rights are clearly infringed. There is nothing in the Constitution that requires that the state grant to all members of the public a common right to use every facility that it affords. Grants in aid of education or for the support of the indigent may properly be made upon an individual basis if no discrimination is practiced; and, if the family, which is the racial unit, may be considered in these, it may be con-

sidered also in providing public schools. The equal protection of the laws does not mean that the child must be treated as the property of the state and the wishes of his family as to his upbringing be disregarded. The classification of children for the purpose of education in separate schools has a basis grounded in reason and experience; and, if equal facilities are afforded, it cannot be condemned as discriminatory for, as said by Mr. Justice Reed in New York Rapid Transit Corp. v. City of New York, 303 U.S. 573, 578, 58 S.Ct. 721, 724, 82 L.Ed. 1024: "It has long been the law under the Fourteenth Amendment that 'a distinction in legislation is not arbitrary, if any state of facts reasonably can be conceived that would sustain it.' " [4]

We are cited to cases having relation to zoning ordinances, restrictive covenants in deeds and segregation in public conveyances. It is clear, however, that nothing said in these cases would justify our disregarding the great volume of authority relating directly to education in the public schools, which involves not transient contacts, but associations which affect the interests of the home and the wishes of the people with regard to the upbringing of their children. As Chief Justice Taft pointed out in Gong Lum v. Rice, supra [275 U.S. 78, 48 S.Ct. 93], "a more difficult" question is presented by segregation in public conveyances than by segregation in the schools.

We conclude, therefore, that if equal facilities are offered, segregation of the races in the public schools as prescribed by the Constitution and laws of South Carolina is not of itself violative of the

---

4. See also, Rast v. Van Deman & Lewis Co., 240 U.S. 342, 357, 36 S.Ct. 370, 60 L.Ed. 679; Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 79 L.Ed. 281; Metropolitan Casualty Ins. Co. v. Brownell, 294 U.S. 580, 584, 55 S.Ct. 538, 79 L.Ed. 1070; State Board of Tax Com'rs v. Jackson, 283 U.S. 527, 537, 51 S.Ct. 540, 75 L.Ed. 1248; Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 55 L. Ed. 369; Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 465, 65 S.Ct. 1384, 89 L.Ed. 1725; Asbury Hospital v. Cass County, N.D., 326 U.S. 207, 215, 66 S.Ct. 61, 90 L.Ed. 6; Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 509, 57 S.Ct. 868, 81 L.Ed. 1245; South Carolina Power Co. v. South Carolina Tax Com'n, 4 Cir., 52 F.2d 515, 518; United States v. Carolene Products Co., 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234; Bowles v. American Brewery, 4 Cir., 146 F.2d 842, 847; White Packing Co. v. Robertson, 4 Cir., 89 F.2d 775, 779.

Fourteenth Amendment. We think that this conclusion is supported by overwhelming authority which we are not at liberty to disregard on the basis of theories advanced by a few educators and sociologists. Even if we felt at liberty to disregard other authorities, we may not ignore the unreversed decisions of the Supreme Court of the United States which are squarely in point and conclusive of the question before us. As said by the Court of Appeals of the Fourth Circuit in Boyer v. Garrett, 183 F.2d 582, a case involving segregation in a public playground, in which equality of treatment was admitted and segregation was attacked as being per se violative of the Fourteenth Amendment: "The contention of plaintiffs is that, notwithstanding this equality of treatment, the rule providing for segregation is violative of the provisions of the federal Constitution. The District Court dismissed the complaint on the authority of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256; and the principal argument made on appeal is that the authority of Plessy v. Ferguson has been so weakened by subsequent decisions that we should no longer consider it as binding. We do not think, however, that we are at liberty thus to disregard a decision of the Supreme Court which that court has not seen fit to overrule and which it expressly refrained from reexamining, although urged to do so, in the very recent case of Sweatt v. Painter [339 U.S. 629], 70 S.Ct. 848 [94 L.Ed. 1114]. It is for the Supreme Court, not us, to overrule its decisions or to hold them outmoded."

To this we may add that, when seventeen states and the Congress of the United States have for more than three-quarters of a century required segregation of the races in the public schools, and when this has received the approval of the leading appellate courts of the country including the unanimous approval of the Supreme Court of the United States at a time when that court included Chief Justice Taft and Justices Stone, Holmes and Brandeis, it is a late day to say that such segregation is violative of fundamental constitutional rights. It is hardly reasonable to suppose that legislative bodies over so wide a territory, including the Congress of the United States, and great judges of high courts have knowingly defied the Constitution for so long a period or that they have acted in ignorance of the meaning of its provisions. The constitutional principle is the same now that it has been throughout this period; and if conditions have changed so that segregation is no longer wise, this is a matter for the legislatures and not for the courts. The members of the judiciary have no more right to read their ideas of sociology into the Constitution than their ideas of economics.

It is argued that, because the school facilities furnished Negroes in District No. 22 are inferior to those furnished white persons, we should enjoin segregation rather than direct the equalizing of conditions. In as much as we think that the law requiring segregation is valid, however, and that the inequality suffered by plaintiffs results, not from the law, but from the way it has been administered, we think that our injunction should be directed to removing the inequalities resulting from administration within the framework of the law rather than to nullifying the law itself. As a court of equity, we should exercise our power to assure to plaintiffs the equality of treatment to which they are entitled with due regard to the legislative policy of the state. In directing that the school facilities afforded Negroes within the district be equalized promptly with those afforded white persons, we are giving plaintiffs all the relief that they can reasonably ask and the relief that is ordinarily granted in cases of this sort. See Carter v. County School Board of Arlington County, Virginia, 4 Cir., 182 F.2d 531. The court should not use its power to abolish segregation in a state where it is required by law if the equality demanded by the Constitution can be attained otherwise. This much is demanded by the spirit of comity which must prevail in the relationship between the agencies of the federal government and the states if our constitutional system is to endure.

Decree will be entered finding that the constitutional and statutory provisions re-

quiring segregation in the public schools are not of themselves violative of the Fourteenth Amendment, but that defendants have denied to plaintiffs rights guaranteed by that amendment in failing to furnish for Negroes in School District 22 educational facilities and opportunities equal to those furnished white persons, and injunction will issue directing defendants promptly to furnish Negroes within the district educational facilities and opportunities equal to those furnished white persons and to report to the court within six months as to the action that has been taken by them to effectuate the court's decree.

Injunction to abolish segregation denied.

Injunction to equalize educational facilities granted.

WARING, District Judge (dissenting).

This case has been brought for the express and declared purpose of determining the right of the State of South Carolina, in its public schools, to practice segregation according to race.

The plaintiffs are all residents of Clarendon County, South Carolina which is situated within the Eastern District of South Carolina and within the jurisdiction of this court. The plaintiffs consist of minors and adults there being forty-six minors who are qualified to attend and are attending the public schools in School District 22 of Clarendon County; and twenty adults who are taxpayers and are either guardians or parents of the minor plaintiffs. The defendants are members of the Board of Trustees of School District 22 and other officials of the educational system of Clarendon County including the superintendent of education. They are the parties in charge of the various schools which are situated within the aforesaid school district and which are affected by the matters set forth in this cause.

The plaintiffs allege that they are discriminated against by the defendants under color of the Constitution and laws of the State of South Carolina whereby they are denied equal educational facilities and opportunities and that this denial is based upon difference in race. And they show that the school system of this particular school district and county (following the general pattern that it is admitted obtains in the State of South Carolina) sets up two classes of schools; one for people said to belong to the white race and the other for people of other races but primarily for those said to belong to the Negro race or of mixed races and either wholly, partially, or faintly alleged to be of African or Negro descent. These plaintiffs bring this action for the enforcement of the rights to which they claim they are entitled and on behalf of many others who are in like plight and condition and the suit is denominated a class suit for the purpose of abrogation of what is claimed to be the enforcement of unfair and discriminatory laws by the defendants. Plaintiffs claim that they are entitled to bring this case and that this court has jurisdiction under the Fourteenth Amendment of the Constitution of the United States and of a number of statutes of the United States, commonly referred to as civil rights statutes.[1] The plaintiffs demand relief under the above referred to sections of the laws of the United States by way of a declaratory judgment and permanent injunction.

It is alleged that the defendants are acting under the authority granted them by the Constitution and laws of the State of South Carolina and that all of these are in contravention of the Constitution and laws of the United States. The particular portions of the laws of South Carolina are as follows:

Article XI, Section 5 is as follows: "Free public schools.—The General Assembly shall provide for a liberal system of free public schools for all children between the ages of six and twenty-one years * * *."

Article XI, Section 7 is as follows: "Separate schools shall be provided for children of the white and colored races, and no child of either race shall ever be

1. Fourteenth Amendment of the Constitution of the United States, Section 1; Title 8 U.S.C.A. §§ 41, 43; Title 28, U.S.C.A. § 1343.

permitted to attend a school provided for children of the other race."

Section 5377 of the Code of Laws of South Carolina is as follows: "It shall be unlawful for pupils of one race to attend the schools provided by boards of trustees for persons of another race."

It is further shown that the defendants are acting under the authority of the Constitution and laws of the State of South Carolina providing for the creation of various school districts,[2] and they have strictly separated and segregated the school facilities, both elementary and high school, according to race. There are, in said school district, three schools which are used exclusively by Negroes: to wit, Rambay Elementary School, Liberty Hill Elementary School, and Scotts Branch Union (a combination of elementary and high school). There are in the same school district, two schools maintained for whites, namely, Summerton Elementary School and Summerton High School. The last named serves some of the other school districts in Clarendon County as well as No. 22.

It appears that the plaintiffs filed a petition with the defendants requesting that the defendants cease discrimination against the Negro children of public school age; and the situation complained of not having been remedied or changed, the plaintiffs now ask this court to require the defendants to grant them their rights guaranteed under the Fourteenth Amendment of the Constitution of the United States and they appeal to the equitable power of this court for declaratory and injunctive relief alleging that they are suffering irreparable injuries and that they have no plain adequate or complete remedy to redress the wrongs and illegal acts complained of other than this suit. And they further point out that large numbers of people and persons are and will be affected by the decision of this court in adjudicating and clarifying the rights of Negroes to obtain education in the public school system of the State of South Carolina without discrimination and denial of equal facilities on account of their race.

The defendants appear and by way of answer deny the allegations of the complaint as to discrimination and inequality and allege that not only are they acting within the laws of the State in enforcing segregation but that all facilities afforded the pupils of different races are adequate and equal and that there is no inequality or discrimination practiced against these plaintiffs or any others by reason of race or color. And they allege that the facilities and opportunities furnished to the colored children are substantially the same as those provided for the white children. And they further base their defense upon the statement that the Constitutional and statutory provisions under attack in this case, that is to say, the provisions requiring separate schools because of race, are a reasonable exercise of the State's police power and that all of the same are valid under the powers possessed by the State of South Carolina and the Constitution of the United States and they deny that the same can be held to be unconstitutional by this Court.

The issues being so drawn and calling for a judgment by the United States Court which would require the issuance of an injunction against State and County officials, it became apparent that it would be necessary that the case be heard in accordance with the statute applicable to cases of this type requiring the calling of a three-judge court.[3] Such a court convened and the case was set for a hearing on May 28, 1951.

The case came on for a trial upon the issues as presented in the complaint and answer. But upon the call of the case, defendants' counsel announced that they wished to make a statement on behalf of the defendants making certain admissions and praying that the Court make a finding as to inequalities in respect to buildings, equipment, facilities, curricula and other aspects of the schools provided for children in School District 22 in Clarendon County

2. Constitution of South Carolina, Article XI, Section 5; Code of Laws, 5301, 5316, 5328, 5404 and 5405; Code of Laws of South Carolina, Sections 5303, 5306, 5343, 5409.

3. Title 28, U.S.C.A. §§ 2281–2284.

540

and giving the public authorities time to formulate plans for ending such inequalities. In this statement defendants claim that they never had intended to discriminate against any of the pupils and although they had filed an answer to the complaint, some five months ago, denying inequalities they now admit that they had found some; but rely upon the fact that subsequent to the institution of this suit, James F. Byrnes, the Governor of South Carolina, had stated in his inaugural address that the State must take steps to provide money for improving educational facilities and that thereafter, the Legislature had adopted certain legislation. They stated that they hoped that in time they would obtain money as a result of the foregoing and improve the school situation.

This statement was allowed to be filed and considered as an amendment to the answer.

By this maneuver, the defendants have endeavored to induce this Court to avoid the primary purpose of the suit. And if the Court should follow this suggestion and fail to meet the issues raised by merely considering this case in the light of another "separate but equal" case, the entire purpose and reason for the institution of the case and the convening of a three-judge court would be voided. The 66 plaintiffs in this cause have brought this suit at what must have cost much in effort and financial expenditures. They are here represented by 6 attorneys, all, save one, practicing lawyers from without the State of South Carolina and coming here from a considerable distance. The plaintiffs have brought a large number of witnesses exclusive of themselves. As a matter of fact, they called and examined 11 witnesses. They said that they had a number more coming who did not arrive in time owing to the shortening of the proceedings and they also stated that they had on hand and had contemplated calling a large number of other witnesses but this became unnecessary by reason of the foregoing admissions by defendants. It certainly appears that large expenses must have been caused by the institution of this case and great efforts expended in gathering data, making a study of the issues involved, interviewing and bringing numerous witnesses, some of whom are foremost scientists in America. And in addition to all of this, these 66 plaintiffs have not merely expended their time and money in order to test this important Constitutional question, but they have shown unexampled courage in bringing and presenting this cause at their own expense in the face of the long established and age-old pattern of the way of life which the State of South Carolina has adopted and practiced and lived in since and as a result of the institution of human slavery.

If a case of this magnitude can be turned aside and a court refused to hear these basic issues by the mere device of admission that some buildings, blackboards, lighting fixtures and toilet facilities are unequal but that they may be remedied by the spending of a few dollars, then, indeed people in the plight in which these plaintiffs are, have no adequate remedy or forum in which to air their wrongs. If this method of judicial evasion be adopted, these very infant plaintiffs now pupils in Clarendon County will probably be bringing suits for their children and grandchildren decades or rather generations hence in an effort to get for their descendants what are today denied to them. If they are entitled to any rights as American citizens, they are entitled to have these rights now and not in the future. And no excuse can be made to deny them these rights which are theirs under the Constitution and laws of America by the use of the false doctrine and patter called "separate but equal" and it is the duty of the Court to meet these issues simply and factually and without fear, sophistry and evasion. If this be the measure of justice to be meted out to them, then, indeed, hundreds, nay thousands, of cases will have to be brought and in each case thousands of dollars will have to be spent for the employment of legal talent and scientific testimony and then the cases will be turned aside, postponed or eliminated by devices such as this.

We should be unwilling to straddle or avoid this issue and if the suggestion made by these defendants is to be adopted as the

type of justice to be meted out by this Court, then I want no part of it.

And so we must and do face, without evasion or equivocation, the question as to whether segregation in education in our schools is legal or whether it cannot exist under our American system as particularly enunciated in the Fourteenth Amendment to the Constitution of the United States.

Before the American Civil War, the institution of human slavery had been adopted and was approved in this country. Slavery was nothing new in the world. From the dawn of history we see aggressors enslaving weak and less fortunate neighbors. Back through the days of early civilization man practiced slavery. We read of it in Biblical days; we read of it in the Greek City States and in the great Roman Empire. Throughout medieval Europe, forms of slavery existed and it was widely practiced in Asia Minor and the Eastern countries and perhaps reached its worst form in Nazi Germany. Class and caste have, unfortunately, existed through the ages. But, in time, mankind, through evolution and progress, through ethical and religious concepts, through the study of the teachings of the great philosophers and the great religious teachers, including especially the founder of Christianity—mankind began to revolt against the enslavement of body, mind and soul of one human being by another. And so there came about a great awakening. The British who had indulged in the slave trade, awakened to the fact that it was immoral and against the right thinking ideology of the Christian world. And in this country, also, came about a moral awakening. Unfortunately, this had not been sufficiently advanced at the time of the adoption of the American Constitution for the institution of slavery to be prohibited. But there was a struggle and the better thinking leaders in our Constitutional Convention endeavored to prohibit slavery but unfortunately compromised the issue on the insistent demands of those who were engaged in the slave trade and the purchase and use of slaves. And so as time went on, slavery was perpetuated and eventually became a part of the life and culture of certain of the States of this Union although the rest of the world looked on with shame and abhorrence.

As was so well said, this country could not continue to exist one-half slave and one-half free and long years of war were entered into before the nation was willing to eradicate this system which was, itself, a denial of the brave and fine statements of the Declaration of Independence and a denial of freedom as envisioned and advocated by our Founders.

The United States then adopted the 13th, 14th and 15th Amendments and it cannot be denied that the basic reason for all of these Amendments to the Constitution was to wipe out completely the institution of slavery and to declare that all citizens in this country should be considered as free, equal and entitled to all of the provisions of citizenship.

The Fourteenth Amendment to the Constitution of the United States is as follows: "Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

It seems to me that it is unnecessary to pore through voluminous arguments and opinions to ascertain what the foregoing means. And while it is true that we have had hundreds, perhaps thousands, of legal opinions outlining and defining the various effects and overtones on our laws and life brought about by the adoption of this Amendment, one of ordinary ability and understanding of the English language will have no trouble in knowing that when this Amendment was adopted, it was intended to do away with discrimination between our citizens.

The Amendment refers to *all* persons. There is nothing in there that attempts to separate, segregate or discriminate against any persons because of their being of

European, Asian or African ancestry. And the plain intendment is that all of these persons are citizens. And then it is provided that no State shall make or enforce any law which shall abridge the privileges of citizens nor shall any state deny "to *any person* within its jurisdiction the equal protection of the laws".

The Amendment was first proposed in 1866 just about a year after the end of the American Civil War and the surrender of the Confederate States government. Within two years, the Amendment was adopted and became part of the Constitution of the United States. It cannot be gainsaid that the Amendment was proposed and adopted wholly and entirely as a result of the great conflict between freedom and slavery. This will be amply substantiated by an examination and appreciation of the proposal and discussion and Congressional debates (see Flack on Adoption of the 14th Amendment) and so it is undeniably true that the three great Amendments were adopted to eliminate not only slavery, itself, but all idea of discrimination and difference between American citizens.

Let us now come to consider whether the Constitution and Laws of the State of South Carolina which we have heretofore quoted are in conflict with the true meaning and intendment of this Fourteenth Amendment. The whole discussion of race and ancestry has been intermingled with sophistry and prejudice. What possible definition can be found for the so-called white race, Negro race or other races? Who is to decide and what is the test? For years, there was much talk of blood and taint of blood. Science tells us that there are but four kinds of blood: A, B, AB and O and these are found in Europens, Asiatics, Africans, Americans and others. And so we need not further consider the irresponsible and baseless references to preservation of "Caucasian blood". So then, what test are we going to use in opening our school doors and labeling them "white" and "Negro"? The law of South Carolina considers a person of one-eighth African ancestry to be a Negro. Why this proportion? Is it based upon any reason: anthropological, historical or ethical? And how are the trustees

to know who are "whites" and who are "Negroes"? If it is dangerous and evil for a white child to be associated with another child, one of whose great-grandparents was of African descent, is it not equally dangerous for one with a one-sixteenth percentage? And if the State has decided that there is danger in contact between the whites and Negroes, isn't it requisite and proper that the State furnish a series of schools one for each of these percentages? If the idea is perfect racial equality in educational systems, why should children of pure African descent be brought in contact with children of one-half, one-fourth, or one-eighth such ancestry? To ask these questions is sufficient answer to them. The whole thing is unreasonable, unscientific and based upon unadulterated prejudice. We see the results of all of this warped thinking in the poor under-privileged and frightened attitude of so many of the Negroes in the southern states; and in the sadistic insistence of the "white supremacists" in declaring that their will must be imposed irrespective of rights of other citizens. This claim of "white supremacy", while fantastic and without foundation, is really believed by them for we have had repeated declarations from leading politicians and governors of this state and other states declaring that "white supremacy" will be endangered by the abolition of segregation. There are present threats, including those of the present Governor of this state, going to the extent of saying that all public education may be abandoned if the courts should grant true equality in educational facilities.

Although some 73 years have passed since the adoption of the Fourteenth Amendment and although it is clearly apparent that its chief purpose, (perhaps we may say its only real purpose) was to remove from Negroes the stigma and status of slavery and to confer upon them full rights as citizens, nevertheless, there has been a long and arduous course of litigation through the years. With some setbacks here and there, the courts have generally and progressively recognized the true meaning of the Fourteenth Amendment and have, from time to time, stricken down the attempts

made by state governments (almost entirely those of the former Confederate states) to restrict the Amendment and to keep Negroes in a different classification so far as their rights and privileges as citizens are concerned. A number of cases have reached the Supreme Court of the United States wherein it became necessary for that tribunal to insist that Negroes be treated as citizens in the performance of jury duty. See Strauder v. West Virginia[4], where the Court says 100 U.S. at page 307, 25 L.Ed. 664; "* * * What is this but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race,—the right to exemption from unfriendly legislation against them distinctively as colored—exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race."

Many subsequent cases have followed and confirmed the right of Negroes to be treated as equals in all jury and grand jury service in the states.

The Supreme Court has stricken down from time to time statutes providing for imprisonment for violation of contracts. These are known as peonage cases and were in regard to statutes primarily aimed at keeping the Negro "in his place".[5]

In the field of transportation the court has now, in effect declared that common carriers engaged in interstate travel must not and cannot segregate and discriminate against passengers by reason of their race or color.[6]

Frequent and repeated instances of prejudice in criminal cases because of the brutal treatment of defendants because of their color have been passed upon in a large number of cases.[7]

Discrimination by segregation of housing facilities and attempts to control the same by covenants have also been outlawed.[8]

In the field of labor employment and particularly the relation of labor unions to the racial problem, discrimination has again been forbidden.[9]

Perhaps the most serious battle for equality of rights has been in the field of exercise of suffrage. For years, certain of the southern states have attempted to prevent the Negro from taking part in elections by various devices. It is unnecessary to enumerate the long list of cases, but from time to time courts have stricken down all of these various devices classed as the "grandfather clause", educational tests and white private clubs.[10]

4. 100 U.S. 303, 25 L.Ed. 664.

5. Peonage: Bailey v. Alabama, 219 U.S. 219, 31 S.Ct. 145, 55 L.Ed. 191; U. S. v. Reynolds, 235 U.S. 133, 35 S.Ct. 86, 59 L.Ed. 162.

6. Transportation: Mitchell v. U. S., 313 U.S. 80, 61 S.Ct. 873, 85 L.Ed. 1201; Morgan v. Virginia, 328 U.S. 373, 66 S. Ct. 1050, 90 L.Ed. 1317; Henderson v. U. S., 339 U.S. 816, 70 S.Ct. 843, 94 L. Ed. 1302; Chance v. Lambeth, 4 Cir., 186 F.2d 879, certiorari denied Atlantic Coast Line R. Co. v. Chance, 341 U.S. 941, 71 S.Ct. 1001, May 28, 1951.

7. Criminals: Brown v. Mississippi, 297 U. S. 278, 56 S.Ct. 461, 80 L.Ed. 682;

Chambers v. Florida, 309 U.S. 227, 60 S. Ct. 472, 84 L.Ed. 716; Shepherd v. Florida, 341 U.S. 50, 71 S.Ct. 549.

8. Housing: Buchanan v. Warley, 245 U. S. 60, 38 S.Ct. 16, 62 L.Ed. 149; Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161.

9. Labor: Steele v. Louisville & N. R. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Tunstall v. Brotherhood of Locomotive Firemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187.

10. Suffrage: Guinn v. U. S., 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340; Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71

The foregoing are but a few brief references to some of the major landmarks in the fight by Negroes for equality. We now come to the more specific question, namely, the field of education. The question of the right of the state to practice segregation by race in certain educational facilities has only recently been tested in the courts. The cases of Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 and Sipuel v. Board of Regents, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247, decided that Negroes were entitled to the same type of legal education that whites were given. It was further decided that the equal facilities must be furnished without delay or as was said in the Sipuel case, the state must provide for equality of education for Negroes "as soon as it does for applicants of any other group". But still we have not reached the exact question that is posed in the instant case.

We now come to the cases that, in my opinion, definitely and conclusively establish the doctrine that separation and segregation according to race is a violation of the Fourteenth Amendment. I, of course, refer to the cases of Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114, and McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149. These cases have been followed in a number of lower court decisions so that there is no longer any question as to the rights of Negroes to enjoy all the rights and facilities afforded by the law schools of the States of Virginia, Louisiana, Delaware, North Carolina and Kentucky. So there is no longer any basis for a state to claim the power to separate according to race in graduate schools, universities and colleges.

The real rock on which the defendants base their case is a decision of the Supreme Court of the United States in the case of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256. This case arose in Louisiana and was heard on appeal in 1895. The case related to the power of the State of Louisiana to require separate railroad cars for white and colored passengers and the Court sustained the State's action. Much discussion has followed this case and the reasoning and decision has been severely criticized for many years. And the famous dissenting opinion by Mr. Justice Harlan has been quoted throughout the years as a true declaration of the meaning of the Fourteenth Amendment and of the spirit of the American Constitution and the American way of life. It has also been frequently pointed out that when that decision was made, practically all the persons of the colored or Negro race had either been born slaves or were the children of slaves and that as yet due to their circumstances and surroundings and the condition in which they had been kept by their former masters, they were hardly looked upon as equals or as American citizens. The reasoning of the prevailing opinion in the Plessy case stems almost completely from a decision by Chief Justice Shaw of Massachusetts [11], which decision was made many years before the Civil War and when, of course, the Fourteenth Amendment had not even been dreamed of.

But these arguments are beside the point in the present case. And we are not called upon to argue or discuss the validity of the Plessy case.

Let it be remembered that the Plessy case decided that separate railroad accommodations might be required by a state in intra-state transportation. How similar attempts relating to inter-state transportation have fared have been shown in the foregoing discussion and notes.[12] It has

---

L.Ed. 759; Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987; Elmore v. Rice, D.C., 72 F. Supp. 516; 4 Cir., 165 F.2d 387; certiorari denied, 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151; Brown v. Baskin, D.C.,

78 F.Supp. 933; Brown v. Baskin, D.C., 80 F.Supp. 1017; 4 Cir., 174 F.2d 391.

11. Roberts v. City of Boston, 5 Cush., Mass., 198.

12. See cases cited in Note 6.

been said and repeated here in argument that the Supreme Court has refused to review the Plessy case in the Sweatt, McLaurin and other cases and this has been pointed to as proof that the Supreme Court retains and approves the validity of Plessy. It is astonishing that such an argument should be presented or used in this or any other court. The Supreme Court in Sweatt and McLaurin was not considering railroad accommodations. It was considering education just as we are considering it here and the Supreme Court distinctly and unequivocally held that the attempt to separate the races in education was violative of the Fourteenth Amendment of the Constitution. Of course, the Supreme Court did not consider overruling Plessy. It was not considering railroad matters, had no arguments in regard to it, had no business or concern with railroad accommodations and should not have even been asked to refer to that case since it had no application or business in the consideration of an educational problem before the court. It seems to me that we have already spent too much time and wasted efforts in attempting to show any similarity between traveling in a railroad coach in the confines of a state and furnishing education to the future citizens of this country.

The instant case which relates to lower school education is based upon exactly the same reasoning followed in the Sweatt and McLaurin decisions. In the Sweatt case, it was clearly recognized that a law school for Negro students had been established and that the Texas courts had found that the privileges, advantages and opportunities offered were substantially equivalent to those offered to white students at the University of Texas. Apparently, the Negro school was adequately housed, staffed and offered full and complete legal education, but the Supreme Court clearly recognized that education does not alone consist of fine buildings, class room furniture and appliances but that included in education must be all the intangibles that come into play in preparing one for meeting life. As was so well said by the Court: " * *. *

Few students and no one who has practiced law would choose to study in an academic vacuum, removed from the interplay of ideas and the exchange of views with which the law is concerned." [339 U.S. 629, 70 S.Ct. 850.] And the Court quotes with approval from its opinion in Shelley v. Kramer, supra: " * * * Equal protection of the laws is not achieved through indiscriminate imposition of inequalities." The Court further points out that this right to a proper and equal education is a personal one and that an individual is entitled to the equal protection of the laws. And in closing, the Court, referring to certain cases cited, says: "In accordance with these cases, petitioner may claim his full constitutional right: legal education equivalent to that offered by the State to students of other races. Such education is not available to him in a separate law school as offered by the State."

In the companion case of McLaurin v. Oklahoma State Regents, McLaurin was a student who was allowed to attend the same classes, hear the same lectures, stand the same examinations and eat in the same cafeteria; but he sat in a marked off place and had a separate table assigned to him in the library and another one in the cafeteria. It was said with truth that these facilities were just as good as those afforded to white students. But the Supreme Court says that even though this be so:

"These restrictions were obviously imposed in order to comply, as nearly as could be, with the statutory requirements of Oklahoma. But they signify that the State, in administering the facilities it affords for professional and graduate study, sets McLaurin apart from the other students. The result is that appellant is handicapped in his pursuit of effective graduate instruction. Such restrictions impair and inhibit his ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession.

"Our society grows increasingly complex, and our need for trained leaders increases correspondingly. Appellant's case represents, perhaps, the epitome of that need,

for he is attempting to obtain an advanced degree in education, to become, by definition, a leader and trainer of others. Those who will come under his guidance and influence must be directly affected by the education he receives. Their own education and development will necessarily suffer to the extent that his training is unequal to that of his classmates. State-imposed restrictions which produce such inequalities cannot be sustained." [339 U. S. 637, 70 S.Ct. 853.]

The recent case of McKissick v. Charmichael, 4 Cir., 187 F.2d 949, 953, wherein the question of admission to the law school of the University of North Carolina was decided follows and amplifies the reasoning of the Sweatt and McLaurin cases. In the McKissick case, officials of the State of North Carolina took the position that they had adopted a fixed and continued purpose to establish and build up separate schools for equality in education and pointed with pride to the large advances that they had made. They showed many actual physical accomplishments and the establishment of a school which they claimed was an equal in many respects and superior in some respects to the school maintained for white students. The Court of Appeals for the 4th Circuit in this case, speaking through Judge Soper, meets this issue without fear or evasion and says: "These circumstances are worthy of consideration by any one who is responsible for the solution of a difficult racial problem; but they do not meet the complainants' case or overcome the deficiencies which it discloses. Indeed the defense seeks in part to avoid the charge of inequality by the paternal suggestion that it would be beneficial to the colored race in North Carolina as a whole, and to the individual plaintiffs in particular, if they would cooperate in promoting the policy adopted by the State rather than seek the best legal education which the State provides. The duty of the federal courts, however, is clear. We must give first place to the rights of the individual citizen, and when and where he seeks only equality of treatment before the law, his

suit must prevail. It is for him to decide in which direction his advantage lies."

In the instant case, the plaintiffs produced a large number of witnesses. It is significant that the defendants brought but two. These last two were not trained educators. One was an official of the Clarendon schools who said that the school system needed improvement and that the school officials were hopeful and expectant of obtaining money from State funds to improve all facilities. The other witness, significantly named Crow, has been recently employed by a commission just established which, it is proposed, will supervise educational facilities in the State and will handle monies if, as and when the same are received sometime in the future. Mr. Crow did not testify as an expert on education although he stated flatly that he believed in separation of the races and that he heard a number of other people say so, including some Negroes, but he was unable to mention any of their names. Mr. Crow explained what was likely and liable to happen under the 1951 State Educational Act to which frequent reference was made in argument on behalf of the defense.

It appears that the Governor of this state called upon the legislature to take action in regard to the dearth of educational facilities in South Carolina pointing out the low depth to which the state had sunk. As a result, an act of the legislature was adopted (this is a part of the General Appropriations Act adopted at the recent session of the legislature and referred to as the 1951 School Act). This Act provides for the appointment of a commission which is to generally supervise educational facilities and imposes sales taxes in order to raise money for educational purposes and authorizes the issuance of bonds not to exceed the sum of $75,000,000, for the purpose of making grants to various counties and school districts to defray the cost of capital improvement in schools. The Commission is granted wide power to accept applications for and approve such grants as loans. It is given wide power as to what schools and school districts are

to receive monies and it is also provided, that from the taxes there are to be allocated funds to the various schools based upon the enrollment of pupils. Nowhere is it specifically provided that there shall be equality of treatment as between whites and Negroes in the school system. It is openly and frankly admitted by all parties that the present facilities are hopelessly disproportional and no one knows how much money would be required to bring the colored school system up to a parity with the white school system. The estimates as to the cost merely of equalization of physical facilities run anywhere from forty to eighty million dollars. Thus, the position of the defendants is that the rights applied for by the plaintiffs are to be denied now because the State of South Carolina intends (as evidenced by a general appropriations bill enacted by the legislature and a speech made by its Governor) to issue bonds, impose taxes, raise money and to do something about the inadequate schools in the future. There is no guarantee or assurance as to when the money will be available. As yet, no bonds have been printed or sold. No money is in the treasury. No plans have been drawn for school buildings or order issued for materials. No allocation has been made to the Clarendon school district or any other school districts and not even application blanks have, as yet, been printed. But according to Mr. Crow, the Clarendon authorities have requested him to send them blanks for this purpose if, as and when they come into being. Can we seriously consider this a bona-fide attempt to provide equal facilities for our school children?

On the other hand, the plaintiffs brought many witnesses, some of them of national reputation in various educational fields. It is unnecessary for me to review or analyze their testimony. But they who had made studies of education and its effect upon children, starting with the lowest grades and studying them up through and into high school, unequivocally testified that aside from inequality in housing appliances and equipment, the mere fact of segregation, itself, had a deleterious and warping effect upon the minds of children. These witnesses testified as to their study and researches and their actual tests with children of varying ages and they showed that the humiliation and disgrace of being set aside and segregated as unfit to associate with others of different color had an evil and ineradicable effect upon the mental processes of our young which would remain with them and deform their view on life until and throughout their maturity. This applies to white as well as Negro children. These witnesses testified from actual study and tests in various parts of the country, including tests in the actual Clarendon School district under consideration. They showed beyond a doubt that the evils of segregation and color prejudice come from early training. And from their testimony as well as from common experience and knowledge and from our own reasoning, we must unavoidably come to the conclusion that racial prejudice is something that is acquired and that that acquiring is in early childhood. When do we get our first ideas of religion, nationality and the other basic ideologies? The vast number of individuals follow religious and political groups because of their childhood training. And it is difficult and nearly impossible to change and eradicate these early prejudices, however strong may be the appeal to reason. There is absolutely no reasonable explanation for racial prejudice. It is all caused by unreasoning emotional reactions and these are gained in early childhood. Let the little child's mind be poisoned by prejudice of this kind and it is practically impossible to ever remove these impressions however many years he may have of teaching by philosophers, religious leaders or patriotic citizens. If segregation is wrong then the place to stop it is in the first grade and not in graduate colleges.

From their testimony, it was clearly apparent, as it should be to any thoughtful person, irrespective of having such expert testimony, that segregation in educa-

548

tion can never produce equality and that it is an evil that must be eradicated. This case presents the matter clearly for adjudication and I am of the opinion that all of the legal guideposts, expert testimony, common sense and reason point unerringly to the conclusion that the system of segregation in education adopted and practiced in the State of South Carolina must go and must go now.

### Segregation is per se inequality.

As heretofore shown, the courts of this land have stricken down discrimination in higher education and have declared unequivocally that segregation is not equality. But these decisions have pruned away only the noxious fruits. Here in this case, we are asked to strike its very root. Or rather, to change the metaphor, we are asked to strike at the cause of infection and not merely at the symptoms of disease. And if the courts of this land are to render justice under the laws without fear or favor, justice for all men and all kinds of men, the time to do it is now and the place is in the elementary schools where our future citizens learn their first lesson to respect the dignity of the individual in a democracy.

To me the situation is clear and important, particularly at this time when our national leaders are called upon to show to the world that our democracy means what it says and that it is a true democracy and there is no under-cover suppression of the rights of any of our citizens because of the pigmentation of their skins. And I had hoped that this Court would take this view of the situation and make a clear cut declaration that the State of South Carolina should follow the intendment and meaning of the Constitution of the United States and that it shall not abridge the privileges accorded to or deny equal protection of its laws to any of its citizens. But since the majority of this Court feel otherwise, and since I cannot concur with them or join in the proposed decree, this opinion is filed as a dissent.