# 𝔚ꝑt𝔥𝔢b𝔦𝔩𝔩𝔢

SARAH B. DAVIS v. COMMONWEALTH OF VIRGINIA.

June 22, 1944.

Record No. 2808.

Present, All the Justices.

The opinion states the case.

*W. L. Davis,* for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *M. Ray Doubles, Assistant Attorney General,* for the Commonwealth.

EGGLESTON, J., delivered the opinion of the court.

This writ of error brings under review a judgment convicting Sarah B. Davis, a member of the colored race and a school teacher, of a violation of the statute which provides for the separation of white and colored passengers in motor busses. Acts 1930, ch. 128, p. 343; Michie's Code of 1942, sections 4097z, 4097aa, 4097bb, 4097cc, 4097dd. The pertinent portion of the Act is copied in the margin.*

*1. " . . . all passenger motor vehicle carriers, operating under the provisions of chapter one hundred and sixty-one-a of the Code of Virginia, shall separate the white and colored passengers in their motor busses and set apart and designate in each bus or other vehicle, a portion thereof, or certain seats therein, to be occupied by white passengers, and a portion thereof or certain seats therein, to be occupied by colored passengers, * * * .

2. "The said companies, corporations or persons so operating motor vehicle carriers shall make no difference or discrimination in the quality or convenience of the accommodations provided for the two races under the provisions of the preceding section.

3. "The driver, operator or other person in charge of any motor vehicle above mentioned, shall have the right, and he is hereby directed and required at any time when it may be necessary or proper for the comfort and convenience of passengers so to do, to change the designation so as to increase or decrease the amount of space or seats set apart for either race; but no contiguous seats on the same bench shall be occupied by white and colored passengers at the same time; and said driver, operator or other person in charge of the vehicle, may require any passenger to change his or her seat as it may be necessary or proper; the driver, operator or other

The warrant under which the plaintiff in error was arrested charged her with a violation of section 5 of the Act (Michie's Code of 1942, section 4097dd), in that she "failed to move to the rear" of a bus of the Virginia Electric and Power Company, on which she was a passenger in the city of Norfolk.

The first contention of the plaintiff in error is that the alleged offense is not covered by the Act. She argues that under the first section (Michie's Code of 1942, section 4097z), the Act applies only to "passenger motor vehicle carriers, operating under the provisions of chapter one hundred and sixty-one-a of the Code of Virginia," and contends that the motor vehicle carriers covered in this chapter are limited to those which operate on the State highway system, exclusive of the streets and alleys in towns and cities. In support of this contention she cites section 1 (c) of the Acts of 1936, ch. 129, p. 230, as amended by Acts 1938, ch. 286, p. 418 (Michie's Code of 1936, section 4097y (1) (c)), included in this chapter of the Code, which defines a "highway" as "excluding the streets and alleys in towns and cities."

---

person in charge of said vehicle who shall fail or refuse to carry out the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than five dollars nor more than twenty-five dollars for each offense.

4. "Each driver, operator or person in charge of any vehicle, in the employment of any company operating the same, while actively engaged in the operation of said vehicle, shall be a special policeman and have all of the powers of conservators of the peace in the enforcement of the provisions of this act. * * * .

5. "All persons who fail while on any motor vehicle carrier, to take and occupy the seat or seats or other space assigned to them by the driver, operator or other person in charge of such vehicle, or by the person whose duty it is to take up tickets or collect fares from passengers therein, or who fail to obey the directions of any such driver, operator or other person in charge, as aforesaid, to change their seats from time to time as occasions require, pursuant to any lawful rule, regulation or custom in force by such lines as to assigning separate seats or other space to white and colored persons, respectively, having been first advised of the fact of such regulation and requested to conform thereto, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than five dollars nor more than twenty-five dollars for each offense. * * * "

■ Chapter 161A of Michie's Code of 1942, which deals with the regulation of motor vehicle carriers, is made up of several independent Acts of the General Assembly, passed at different sessions. While the 1936 Act, as amended, cited by the plaintiff in error, applies to motor vehicle carriers which operate their vehicles on the State highways, "excluding the streets and alleys in towns and cities," section 1 (f) of the Acts of 1932, ch. 360, p. 707 (Michie's Code of 1942, section 4097y14, (f) ), likewise found in chapter 161A, makes the latter statute applicable to motor vehicle carriers which operate on such highways, "including the streets and alleys in towns and cities." The 1936 Act, as amended, is supplementary to the 1932 Act, and both are in effect. Hence, both types of carriers, dealt with in the two statutes, operate under the regulatory provisions of chapter 161A, and are, therefore, subject to the segregation statute under which the present prosecution was brought.

On the merits the main facts are not in dispute. When the plaintiff in error boarded the bus, it was filled with passengers, both white and colored, some of whom were standing in the aisle. There was but one vacant seat which was between two white men who were seated on a bench running lengthwise, near the front of the bus, and designed to accommodate three passengers. The plaintiff in error, who was carrying a number of bundles, took her seat between these two white men.

. According to the bus driver, when he observed that she was seated in that portion of the vehicle which was set aside for white passengers, he said to her, "You can't sit there," to which she replied, "Well, I am going to sit here." "I refuse to move." He then undertook to explain to her the segregation law, but she replied that she knew its terms and her rights and that she would not move from her seat. Thereupon he drove the bus to the police station and procured a warrant for her arrest.

According to the testimony of the plaintiff in error, when the bus driver said to her, "You can't sit there," she inquired, "Where will I sit?" to which he replied, "I don't care where

you sit, as long as you get up and get on in the back of the bus."

The evidence is undisputed that although there were a number of white passengers seated near the rear of the bus, the bus driver made no request of any one of them to move to the front and exchange seats with the plaintiff in error. While he testified that it was his intention to have arranged such an exchange, had she not declined to move, he made no claim that he in any way indicated to her his intent or willingness to make this arrangement.

The plaintiff in error testified that she was quite willing to have exchanged seats with a white passenger in the rear of the bus, had the bus driver made this suggestion to her, but that until he did so she thought that she was within her rights in refusing to vacate the seat which she occupied.

Section 5 of the Act (Michie's Code of 1942, section 4097dd), under which the prosecution is had, provides for the punishment of two offenses by a passenger, stated in the alternative: (1) the failure "to take and occupy the seat or seats or other space assigned" to him by the "driver" or "operator" of the vehicle; "or," (2) the failure "to obey the directions of any such driver" to "change" his seat "from time to time as occasions require, pursuant to any lawful rule, regulation or custom in force by such lines as to assigning separate seats or other space to white and colored persons, respectively, having been first advised of the fact of such regulation and requested to conform thereto."

We need not stop to consider whether the curt remark of the bus driver to the plaintiff in error, "I don't care where you sit, as long as you get up and get on in the back of the bus," was a sufficient assignment of "space" to be occupied by her, or whether the colloquy which he details was a sufficient advice by him to her of "the fact of such regulation" of his company with respect to the separation of the races, and a sufficient request that she "conform thereto," so as to render her amenable to conviction for failure to comply with his directions or command. We are of opinion that the refusal of the plaintiff in error to vacate

her seat, under the stated circumstances, was not a violation of the statute.

It is necessary to the validity of segregation statutes that there be no discrimination either in their terms or in their enforcement. There must be "substantial equality of treatment" as well as substantial equality of facilities furnished. *McCabe* v. *Atchison, etc., R. Co.*, 235 U. S. 151, 161, 162, 35 S. Ct. 69, 71, 59 L. Ed. 169. A statute which permits inequality of treatment to the members of the two races would be plainly invalid.

It is patent that the draftsman of the present Act appreciated this fundamental principle. Section 2 of the Act (Michie's Code of 1942, section 4097aa) expressly provides that carriers "shall make no difference or discrimination in the quality or convenience of the accommodations provided for the two races".

Section 3 of the Act (Michie's Code of 1942, section 4097bb) provides that the driver or operator of the bus "shall have the right, and he is hereby directed and required at any time when it may be necessary or proper for the comfort and convenience of passengers so to do, to change the designation so as to increase or decrease the amount of space or seats set apart for either race; * * * ."

The summary direction of the bus driver to the plaintiff in error to vacate her seat in the front of the bus and move to the rear, under the stated circumstances, was, in our opinion, an attempt on his part to enforce the statute in a discriminatory manner, and in a way not authorized by its terms. He made no request of any white passenger to move forward in the bus and exchange places with the plaintiff in error in order that she might occupy that portion of the vehicle required of her under the law, nor did he suggest such arrangement to her. In effect, he undertook to enforce the statute against the plaintiff in error, a colored person, without at the same time enforcing it against a white person. And this he had no right to do.

Under the statute the first duty was upon him, and not upon her, for section 3 of the Act (Michie's Code of 1942,

section 4097bb) gives him the right and places upon him the duty "to change the designation" of seating space so as to accommodate the "comfort and convenience" of the passengers, and to "require any passenger to change his or her seat as it may be necessary or proper," in enforcing the segregation of the members of the two races.

Moreover, Rule 48 of the carrier company, offered in evidence by the Commonwealth, provides: "When a passenger fails to take a seat in the proper part of the car or bus, and it becomes necessary for such passenger to move, in order to prevent the races from sitting side by side or occupying adjoining seats, the operator will politely request such passenger to change his seat or location on the car or bus, advising such passenger, if necessary, that such seating arrangement is required by law."

The operator of the bus, by virtue of his employment and the duties imposed upon him by the statute, occupies a position where, in dealing with the public, a high degree of discretion and fairness is required of him. In a sense he is in a position superior to that of the passengers by reason of his right and duty to direct their seating. He should follow both the letter and the spirit of the law in taking the lead in explaining the situation and in directing its peaceful adjustment. Not only is the duty upon him to provide a seat or space for each passenger, but he is the only one authorized to take such action and to direct its course. Until he had performed the duty placed upon him by the statute, and the plaintiff in error had refused to acquiesce therein, she was guilty of no offense.

It is argued that to require the bus driver to arrange an exchange of seats between white and colored passengers, in such a manner, would seriously impair the maintenance of his schedule. It is a sufficient answer to point out that section 3 of the Act (Michie's Code of 1942, section 4097bb) places this duty upon him and makes his failure to comply therewith a misdemeanor punishable by a fine.

It follows from what we have said that the evidence is insufficient to sustain the conviction of the plaintiff in error.

Accordingly, the judgment is reversed and the warrant is dismissed.

*Reversed and dismissed.*

HOLT, J., dissenting.

The power of the State to segregate white and colored passengers in intra-state transportation has received wide judicial approval. *Virginia Ry., etc., Co.* v. *Deaton,* 147 Va. 576, 137 S. E. 500; *Plessy* v. *Ferguson,* 163 U. S. 537, 540, 16 S. Ct. 1138, 41 L. Ed. 256; R. C. L. 4-1079 and 5-590,721; 13 C. J. S. 1210; 10 Am. Jur. 907.

In support of these text writers are cited a host of cases. They embody what is the settled public policy of this Commonwealth, reflect public opinion and lessen racial friction.

We are dealing with a two-way road. Most white people are not anxious to sit with colored people, and few colored people care to sit with those white people who want to sit with them.

Segregation is settled law in Virginia. Those who oppose it, whatever be their reasons—social, political or economic—have not even appealed to the Legislature for relief. If the courts cannot whittle it away, they must disquiet themselves in vain.

With these general observations, we come to the case at bar.

The court has examined in detail our segregation statutes, has pronounced them good, and has thereupon proceeded without more ado to eviscerate them.

First, it appeals to our sympathy. Defendant is pictured as a woman laden down with bundles, sinking exhausted into the first available seat. "The plaintiff in error, who was carrying a number of bundles, took her seat between two white men." As a matter of fact, she tells us that she had two bundles.

She was accompanied by a negro man and friend of hers who carried for her this heavy load. The driver tells us:

"A. Well, it was some fellow with her, had a lot of bundles, and she got on the bus behind this fellow and sat down on the right front seat, which was occupied by two white people; she sat down between the two of them."

He moved on to the rear of the bus and to the section assigned to colored people, and then four times begged his lady friend to come on back where he was and not to create a disturbance.

Some indignation is suggested; complaint is made of the "curt command of the bus driver." Not all bus drivers are Knights of the Round Table. What the bus driver said was: "You can't sit there." It was a normal observation and such as might have been expected.

This suggestion was afterwards modified, and it is now said that "we need not stop to consider whether the curt remark" etc. I do not know where the suggestion that it was a "curt remark" comes from unless it be from thin air. An innocent observation may, within the larger meaning of a voice, be both provocative and insulting. In this case we have but an unemotional, typewritten statement from which neither conclusion can be drawn. Assuming, but not conceding, that the driver's observation was irritating, she countered with a Roland for his Oliver. She said that she knew the law and was not going to move.

As the trial court had occasion to observe, she showed no disposition to collaborate with the driver in smoothing out a situation for which she was responsible. She stood upon what she conceived to be her rights and craved the law. Those who take the sword sometimes perish by it.

Trouble really came from the intransigent attitude of the defendant. She tells us that she is a school teacher; that her husband is a sergeant; that she knew the law and was not going to move. In the court's opinion it is said:

"The plaintiff in error testified that she was quite willing to have exchanged seats with a white passenger in the rear of the bus, had the bus driver made this suggestion to her,

but that until he did so she thought that she was within her rights in refusing to vacate the seat which she occupied."

I do not know what was in the back of her mind—I only know what she said, which is that she was "not going to move." If I were to guess, I would say that this was in the back of her mind: "I am as good as anybody else"—a proposition which I shall not undertake to dispute.

It is said that equality of races must be observed; that each is entitled to like accommodations. Since this is everywhere conceded, argument or authorities in its support are works of supererogation.

Lest it be thought that I draw improper deductions from the evidence, I set out that heard *ore tenus* which supports the judgment:

"A. I says, 'You can't sit there.' She says, 'Well, I am going to sit here.' I said, 'Well, you can't.' She says, 'Well, I refuse to move.' * * * "

He undertook to explain to her what the law was, to which she answered: "I know what I am doing; I can read."

Again:

"Q. Did you request her to leave the bus if she would not move?

"A. No. She flatly refused to move—she would not move at all—by me requesting her wouldn't do any good, because she wouldn't get up.

"Q. She would not get up?

"A. She would not get up, no.

"Q. And would not listen to you?

"A. Would not listen to me at all."

Again, on cross-examination, Sarah B. Davis testified:

"Q. But, you say, you did know the rules that the colored people were supposed to start in the back and work

forward, and the white people were supposed to start in the front and work backward?

"A. Yes.

"Q. And both were not to sit on the same seat together?

"A. Unless there were no vacant seats. That is written up in the bus. That is where I felt I was right.

"Q. Your construction was that if there was just one vacant seat, you could sit there regardless?

"A. Yes.

"Q. That is still your contention?

"A. That is still my intention?

"Q. Contention?

"A. My contention? Yes."

Questioned by the court, she was asked if she was standing upon her legal rights and answered:

"A. Yes, sir.

"Q. You thought that you had the right—

"A. To sit there—yes, I did, Judge.

"Q. And you were not going to move?

"A. No, sir."

Four times she was asked by her friend who came aboard this bus with her and who had moved to the rear, "Why don't you come back here in the back of the bus and not cause any trouble."

At the risk of repetition, we restate some of the evidence. The bus driver said:

"A. I says, 'You can't sit there.' She says, 'Well, I am going to sit here.' I said, 'Well, you can't.' She says, 'Well, I refuse to move.'"

This is his final statement on cross-examination:

"Q. Then is when you tried to explain what you call the 'Jim Crow Law'?

"A. I tried to explain the law and told her what I would do and how I would re-arrange it, and everything, and she wouldn't listen to me."

It is true that Code, section 4097dd, makes provision for the assignment of seats to the several races. That means no more than that the bus driver shall see that the several races sit in the spaces set apart for them. To hold that the bus driver must assign and conduct *ex mero motu* all passengers to their seats is something new. Statutes on this subject, read together, show that it is the duty of bus drivers to see that members of the different races occupy the spaces assigned to them, and that is all that he has to do.

By statute, space assignable to the different races varies with traffic demands.

There had been no trouble until the plaintiff came aboard, and there is nothing to indicate that any white person occupied a seat which had been set aside for the colored. In order to readjust assignments, it became necessary to give to a colored person a seat heretofore taken and presumably properly taken by a white person. In a proper readjustment, this white person should have surrendered his seat and come forward, while the colored person should have surrendered her seat and moved back. This the bus driver attempted to explain to the defendant, but, as he expresses it, "Every time I opened my mouth she wanted to shove her foot in it. What I mean to say is that she wouldn't listen to what I had to say." What the defendant said was that she was "not going to move."

With this flat and final statement of her "intention", there was nothing else for the bus driver to do, and there was no occasion to bring a white passenger in the rear forward. Had he come forward, there would have been no place for him to sit, for the woman had said that she was not going to move. Moreover, in any aspect of the case, the bus driver could not make the woman and the man get up at the same moment. Some one had to move first, and if the

woman had gone to the rear, she would have been given the seat that would have been vacated on her approach.

This is no effort of an impecunious defendant to escape from the crushing burden of a $5.00 fine. Her husband, the sergeant, might have paid it, and she might have paid it from her salary as a school teacher. It is really an assault upon the segregation statutes themselves and, in substance, a request that they be emasculated; or, as the dictionary puts it, that they may be whittled away by "interpretation." In other words, she would put these statutes to the test, and to that extent I am in cordial accord.

What would be the final conclusions of the Supreme Court on appeal we cannot know.

HUDGINS, J., dissenting.

Defendant plead not guilty and waived a jury, thus submitting all questions of fact as well as law to the trial judge. This being true, the findings of fact by the trial judge, if supported by substantial evidence, are binding upon this court. All conflicts in testimony must be regarded as settled in favor of the Commonwealth. The Commonwealth, as the victorious litigant in the trial court, is entitled to have the facts stated in the light most favorable to it. Applying this principle, it seems to me that a fair statement of the facts is substantially as follows:

When the operator of the bus observed defendant sitting on the front seat between two white persons, he said: "You can't sit there." She replied: "Well, I am going to sit here." He then stopped the bus, got up from his seat and tried to explain the segregation law to defendant, but she would not listen to him and refused to follow the advice of her companion, who repeatedly asked her to move to the back of the bus and avoid trouble. To all of this she replied: "I know what I am doing; I can read."

The operator of the bus not only made several attempts to explain to defendant the provisions of the segregation statute, but tried to tell her that he would re-arrange the

seating of the passengers so that she would have a seat in the back of the bus. Again she refused to listen to or heed the operator of the bus.

Defendant's attitude of defiance, which appears from the testimony of the bus driver, is also revealed in her own testimony. She said that she construed the law to give her a right to occupy the only vacant seat on the bus regardless of its location. Her refusal to move and her refusal to listen to the officer's explanation of the provisions of the statute were based on her own construction of those provisions. In reply to a question asked by the trial judge, she said that she still thought she had a right to sit in that particular seat, and that, acting on that belief, she had refused to move.

Confronted with this situation, it was futile for the operator of the bus to ask any other passenger to exchange seats with defendant, who had expressed a determination to remain where she was.

I quite agree with the statement in the majority opinion to the effect that there should be no discrimination in the enforcement of the segregation act, and that there must be substantial equality of treatment under the act. It is the duty of every passenger, white or colored, to obey all laws, as well as this particular law. This obedience becomes more imperative when the operator of a bus, clothed with police power, demands or requests any one violating the law to observe it. It so happens that on this particular occasion a Negro woman was violating the statute. When she was requested to conform her actions to the provisions of the statute, she placed her own construction upon such provisions, disregarded the instructions of the person in authority and declared her intention to remain where she was regardless of all consequences. There is no evidence of any partiality or discrimination in favor of one race over the other in the request of the operator of the bus to this defendant, nor does it appear that he attempted to enforce the statute in a discriminatory manner.

Under the statute, as construed in the majority opinion, it is the duty of those in charge of all carriers transporting passengers for hire in Virginia to enforce the statute in a discriminatory manner; that is, those in charge of such transportation must require a white passenger to move his seat before a Negro passenger is approached or asked to move to some other space in the coach or bus. This is not "substantial equality of treatment."

It is discrimination against white passengers in favor of Negro passengers. This discrimination is just as obnoxious to the purpose of the statute as if the partiality had been shown white passengers over Negro passengers.