## Staunton

COMMONWEALTH OF VIRGINIA, EX REL. v. CAROLINA COACH COMPANY OF VIRGINIA.

September 5, 1951.

Record No. 3815.

Present, Eggleston, Spratley, Buchanan, Miller, Smith and Whittle, JJ.

The opinion states the case.

*Hill, Martin & Robinson,* for the appellant.

*John J. Wicker, Jr., E. Ballard Baker* and *Paul M. Shuford,* for the appellee.

MILLER, J., delivered the opinion of the court.

The Carolina Coach Company of Virginia is the holder of certificates of public convenience and necessity from the Virginia State Corporation Commission (hereinafter called the Commission) under which it is authorized to engage in the common carriage of passengers over designated State highways and along these routes it operates a fleet of busses and transports passengers for hire.

Under section 156(b) of the Constitution of Virginia and section 52-276, Code of Virginia, 1950, the Commission is empowered and required to supervise, regulate and control motor carriers doing business in this State and make and impose such rules and regulations upon them as are necessary to prevent unjust or unreasonable discrimination in favor of or against any person. (See also sec. 12-14, Code, 1950.)

An act of the General Assembly of Virginia, 1930, ch. 128, p. 343 (sections 56-326, 56-327, 56-328, 56-329, and 56-330, Code of 1950, formerly sections 4097z, 4097aa, 4097bb, 4097cc and

4097dd, Code, 1942, Michie), provides for the separation and segregation of white and colored passengers in motor busses.

The pertinent parts of the Act are in the footnote below.[1]

The motor carrier is required by the Act to separate white and colored passengers by designating in each bus a portion thereof or certain seats therein to be occupied by the passengers of the respective races, but no discrimination in quality or convenience of accommodations for or against either race is permitted, and when necessary for the convenience and comfort of the passengers, the driver is empowered and directed to increase or decrease the space or number of seats set apart for either race, *"but no contiguous seats on the same bench shall be occupied by white or colored passengers at the same time."* (Emphasis added.) The Act also provides that the passengers shall occupy the seat or seats or space assigned to them and shall

[1] "* * * all passenger motor vehicle carriers, operating under the provisions of chapter one hundred and sixty-one-a of the Code of Virginia, shall separate the white and colored passengers in their motor busses and set apart and designate in each bus or other vehicle, a portion thereof, or certain seats therein, to be occupied by white passengers, and a portion thereof or certain seats therein, to be occupied by colored passengers, * * *.

"2. The said companies, corporations or persons so operating motor vehicle carriers shall make no difference or discrimination in the quality or convenience of the accommodations provided for the two races under the provisions of the preceding section.

"3. The driver, operator, or other person in charge of any motor vehicle above mentioned shall have the right and he is hereby directed and required at any time when it may be necessary or proper for the comfort and convenience of passengers so to do, to change the designation so as to increase or decrease the amount of space or seats set apart for either race; but no contiguous seats on the same bench shall be occupied by white and colored passengers at the same time; and said driver, operator or other person in charge of the vehicle, may require any passenger to change his or her seat as it may be necessary or proper; * * *.

"4. Each driver, operator or person in charge of any vehicle, in the employment of any company operating the same, while actively engaged in the operation of said vehicle, shall be a special policeman and have all of the powers of conservators of the peace in the enforcement of this act. * * *.

"5. All persons who fail while on any motor vehicle carrier, to take and occupy the seat or seats or other space assigned to them by the driver, operator or other person in charge of such vehicle, or by the person whose duty it is to take up tickets or collect fares from passengers therein, or who fail to obey the directions of any such driver, operator or other person in charge, as aforesaid, to change their seats from time to time as occasions require, pursuant to any lawful rule, regulation or custom in force by such lines as to assigning separate seats or other space to white and colored passengers, respectively, having been first advised of the fact of such regulation and requested to conform thereto, shall be deemed guilty of a misdmeanor, * * *. Furthermore, such persons may be ejected from such vehicle by any driver, operator or person in charge of said vehicle, or by any police officer or other conservator of the peace. * * *."

change their seats from time to time as occasions may require "pursuant to any lawful rule, regulation or custom in force" by the carrier "as to assigning separate seats or other space to white and colored passengers."

In conformity with the Act, rules and regulations were promulgated and published by the Company. The material parts of those rules are:

"NOTICE TO PASSENGERS.

"Rules and Regulations.

"To enable this Company to perform the duties it has undertaken, to protect its property and business, to preserve order and decorum, and for the safety, convenience, and comfort of its passengers, it hereby publishes the following rules and regulations:

\* \* \* \* \* \*

"2. The Company reserves full control and discretion as to the seating of passengers, reserves the right to change such seating at any time during a trip, and reserves the right to transfer passengers from one vehicle to another whenever necessary.

"3. White passengers will occupy space nearest the front of the bus, and colored passengers will occupy space nearest the rear of the bus.

"4. The Company reserves the right to refuse to transport a person \* \* \* whose conduct is such, or is likely to become such, as to make him or her objectionable to other passengers.

"5. Any passenger who shall engage in any disorderly conduct on a bus \* \* \* or who shall fail or refuse to comply with these regulations, shall be subject to removal.

"6. All passengers carried by this Company are subject to these Rules and Regulations, and all Company drivers, dispatchers and supervisors are instructed and directed to enforce them."

The facts bearing upon the legal question presented in this case are as follows:

On April 11, 1950, Everett Raney, herein called petitioner, a young negro man who resides in Suffolk, Virginia, and who was aware of the Virginia statutes and familiar with the rules and regulations of the Company, undertook to board one of the Company's busses for an intrastate trip to Norfolk, Virginia. He held a ticket from Suffolk to Norfolk, which provided that "the

purchaser of this ticket accepts it subject to the rules and regulations of this Company and of the carrying Company.''

The bus petitioner boarded was of the usual type, having a center aisle with a row of seats on each side with space on each seat for two passengers, and a longer seat or bench across the bus at the rear which accommodated several occupants. When he entered the bus it contained almost an equal number of white and colored passengers and all seats were occupied but one. This vacant seat was on the aisle near the front part of the bus and next to a white woman, that is, the white passenger occupied the position on the dual seat next to the window, leaving the half of the seat on the aisle vacant. The two sets of seats immediately behind this one were occupied by white passengers. Petitioner took the vacant seat near the front of the bus and when the driver noticed that he was seated on the same bench, beside and contiguous to a white passenger, he asked him to move, which he declined to do unless the driver secured him another seat.

The driver surveyed the situation and ascertained that there was no other vacant seat nor could any be secured by rearranging the passengers. All seating room was taken except this space for one passenger beside the white occupant. The driver was aware that the Virginia statute and the ''Rules and Regulations'' of the Company forbade him to move the bus with white and colored passengers occupying contiguous seats. He, therefore, explained this to petitioner and made further request of him that he vacate that seat, and upon his continued refusal to move, he was tendered back his ticket which he declined to accept.

The driver then sought the assistance of two city police officers who likewise requested Raney to move, but they were unsuccessful in their effort. All passengers were then asked by the driver to leave the bus. Upon their compliance, he drove the bus around the block and back to the terminal and began to reload the passengers. To comply with a company rule that ''through passengers'' who temporarily get off a bus at stops along the route shall retain their seats, he undertook to readmit those passengers first. However, well before all ''through passengers'' had re-entered the bus, Raney presented himself in the door and undertook to enter, but was directed to move by one of the police officers. He thereupon remarked, ''Thank you for helping me prove my case'', and left.

In short, petitioner was not denied transportation, but was

not allowed to sit in the one vacant seat on the bench with and contiguous to the white passenger, and being denied that seat, he declined to stand and left.

Petitioner thereupon instituted this proceeding before the State Corporation Commission under section 56-6, Code of Virginia, 1950, in which he alleged that as an individual and passenger upon the common carrier, he had been discriminated against because of his race and color. He prayed that an injunction issue restraining the carrier from again discriminating against him in its carriage of him as a passenger from Suffolk, Virginia, to Norfolk, Virginia, or elsewhere, and that it be compelled and required to perform its public duties by transporting him without discrmination. The Commission concluded that petitioner had not been discriminated against and no right guaranteed to him under the Fourteenth Amendment to the Constitution of the United States denied, and from an order refusing the injunction and denying the relief prayed for, he appealed.

There is no indication in the record that any occupant of the bus was an interstate passenger, nor from what point or points the bus had traveled before it reached Suffolk, Virginia, en route to Norfolk, Virginia. It is thus clear that no question concerning the transportation of interstate passengers is presented in this case.

In *New* v. *Atlantic Greyhound Lines,* 186 Va. 726, 43 S. E. (2d) 872, we held that the decision of *Morgan* v. *Commonwealth,* 328 U. S. 373, 66 S. Ct. 1050, 90 L. ed. 1317, 165 A.L.R. 574, (reversing *Morgan* v. *Commonwealth,* 184 Va. 24, 34 S. E. (2d) 491), did not render Acts of Assembly of 1930, ch. 128, p. 343, *supra,* wholly invalid and inoperative. In the *Morgan Case,* the Supreme Court of the United States in 1946 decided that when applied to interstate passengers the statute imposed undue and unreasonable burdens upon interstate commerce which requires uniformity and was thus beyond a state's power and invalid. Thereafter, in the *New Case* decided in 1947, we concluded and held that the sections of our Code in question might be applied to and were valid and operative upon intrastate passengers though inoperative as to interstate passengers. 11 Am. Jur., "Constitutional Law", secs. 163, 164 and 165. The Act was held to be severable as to subject matter and legal operation as between intrastate and interstate commerce and could and would be ap-

plied solely to the former class of passengers, and when so applied, was reasonable and within the police power of the State.

 Thus construed, the public policy of the State and the purpose of the Act are that white and colored passengers in intrastate carriage, though given equal accommodations, shall be separated from physical and intimate contact. That purpose and intent is unequivocally stated and made abundantly clear by the phrase in section 56-328, "but no contiguous seats on the same bench shall be occupied by white and colored passengers at the same time."

Petitioner does not contend that the sections of the Virginia Code in question really and in truth contravene the provisions of the Fourteenth Amendment of the United States Constitution. He does, however, say that as construed and enforced by the Company through its rules, he is denied rights guaranteed to him as an individual under that amendment, which provides that, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." He insists that the Virginia statutes should be so interpreted and enforced as to allow and bring about separation of the white and colored races on the carrier so long as no one is denied an available seat. In the final analysis, if the last and only seating space available to an occupant of the bus is on the same bench with, beside and contiguous to a passenger of the opposite race (as was true in the instant case), then he insists that the statute and rules of the Company may and must be construed so as to allow the passenger to be seated.

 In view of the clear context and obvious purpose of the Virginia Act, we cannot give assent to that interpretation and construction. Though providing that the white and colored passengers shall be given equal accommodations and no discrimination practiced, the purpose of the Act to separate white and colored passengers in intrastate carriage from actual physical and intimate contact upon the same bench or seat is made certain and clear. In the plain and unequivocal language, i. e., "but no contiguous seats on the same bench shall be occupied by white and colored passengers at the same time", there is no ambiguity or uncertainty. It undoubtedly means that individuals of the two

races shall not occupy contiguous space or seats on the same bench.

In short, this is a mandatory separation and segregation of the races on a bench seating basis. That is to say, each race is, by the method adopted, allowed and entitled to equal space and accommodation and each passenger entitled to the same rights as he boards the bus, and all reasonable and practical means must be resorted to so as to accomplish and preserve that status. Yet when a member of one race boards the bus as a passenger and first occupies one of the benches allotted to his race, a member of the other race may not occupy the contiguous space on that particular bench. Thus reasonable physical segregation of individuals of the opposite races is effected upon that basis of separation and inconvenience seldom imposed upon any passenger of either race.

Chief among the decisions cited and relied upon by petitioner in his contention that the Virginia statute, as construed and enforced in the rules and regulations of the Company, violates his rights under the Fourteenth Amendment are *Buchanan* v. *Warley*, 245 U. S. 60, 38 S. Ct. 16, 62 L. ed. 149, Ann. Cas. 1918a, 1201; *Chance* v. *Lambeth*, 186 F. (2d) 879; *Henderson* v. *United States*, 339 U. S. 816, 70 S. Ct. 843, and *Washington, etc., Elec. Ry. Co.* v. *Waller*, 53 App. D. C. 200, 289 F. 598, 30 A.L.R. 50.

It is sufficient to say that none of the above cases deals with or disposes of the precise question here presented. The *Buchanan Case* had to do with the validity of a city ordinance which forbade colored persons the right to occupy houses in blocks where the greater number were occupied by members of the white race. The ordinance was held to be unconstitutional and invalid because its practical effect was to prevent the sale to or acquisition of property by a colored person. The other three cases cited above, as well as *Morgan* v. *Commonwealth, supra, Mitchell* v. *United States*, 313 U. S. 80, 61 S. Ct. 873, 85 L. ed. 1201, and *Whiteside* v. *Southern Bus Lines*, 177 F. (2d) 949, mentioned in argument and relied upon to some extent, all deal with interstate passengers and hinged upon the terms and effect of section 3(1) of the Interstate Commerce Act, Title 49, U. S. C. A., or Article 1, sec. 8, cl. 3 of the Constitution of the United States.

More nearly similar to the case at bar factually and in the resultant legal question presented than any other decision that

we have found (except the Virginia case of *New* v. *Atlantic Greyhound Lines, supra*), is *Plessy* v. *Ferguson*, 163 U. S. 537, 16 S. Ct. 1138, 41 L. ed. 256. There a Louisiana statute which required separation and segregation on all railroad trains of the white and colored races in intrastate transportation was assailed as violative of the Fourteenth Amendment to the Constitution of the United States. The first section of that statute provided, ''that all railway companies carrying passengers in their coaches in this State, shall provide equal but separate accommodations for the white, and colored races, by providing two or more passenger coaches for each passenger train, or by dividing the passenger coaches by a partition so as to secure separate accommodations: *Provided,* * * * No person or persons, shall be admitted to occupy seats in coaches, other than, the ones, assigned to them on account of the race they belong to.''

Other parts of the act required that the officers of passenger trains should assign ''each passenger to the coach or compartment used for the race to which such passenger belongs'' and any passenger who insisted upon going into a coach or compartment to which by race he did not belong was liable to fine or imprisonment and any officer of the carrier who insisted upon assigning a passenger to a coach or compartment other than the one set aside for his race was likewise made liable to punishment. In holding the act valid and not in contravention of the Fourteenth Amendment, the court said:

''The object of the amendment was undoubtedly to enforce the absolute equality of the two races before the law, but in the nature of things it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation in places where they are liable to be brought into contact do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power.'' (163 U. S. at p. 544.)

'' * * * we think the enforced separation of the races, as applied to the internal commerce of the State, neither abridges the privileges or immunities of the colored man, deprives him of his property without due process of law, nor denies him the

equal protection of the laws, within the meaning of the Fourteenth Amendment. * * * ''. (163 U. S. at p. 548.)

"So far, then, as a conflict with the Fourteenth Amendment is concerned, the case reduces itself to the question whether the statute of Louisiana is a reasonable regulation, and with respect to this there must necessarily be a large discretion on the part of the legislature. In determining the question of reasonableness it is at liberty to act with reference to the established usages, customs and traditions of the people, and with a view to the promotion of their comfort, and the preservation of the public peace and good order. Gauged by this standard, we cannot say that a law which authorizes or even requires the separation of the two races in public conveyances is unreasonable. * * *.'' (163 U. S. at p. 550.)

In *Plessy* v. *Ferguson, supra,* segregation and separation of the races in intrastate carriage was adjudged within the police powers of a state and valid. Within recent weeks the conclusion reached in that decision has been approved and the principle adhered to reaffirmed in *Briggs* v. *Elliott,* 98 F. Supp. 529. To say that there may be separation of the races by allotting to each race certain coaches or partitions within a coach, but such segregation may not be had by allottment of different benches or dual seats within a bus to each race is to purposely overlook and evade the realities and practical results of that decision. There is not and cannot be any fundamental or legal difference in segregation by seats on a bus and segregation by coaches or compartments on a train. For we know that factually and in reality all seats in a coach or in a partitioned part of a coach assigned to one race must, in the nature of things, be at times occupied and no seat available to a passenger of that race when there are unoccupied seats in the other coach or partitioned space allotted the other race. The physical difference, such as it is, in the two methods or modes of segregation is that segregation by seats affords a more equitable allotment of space and convenience than does separation by coaches or by partitions in coaches.

By this legislation, no paramount rights or privileges are given to one race over the other or to one individual over another. It is not due to any discrimination, but to circumstances, applying alike to all—as well to a white citizen as to a colored one, that a member of one race or the other may under some conditions find no seating accommodation available.

■ We find no discrimination against the enjoyment of fundamental rights and thus denial of "the equal protection of the law" when seating accommodations have been *bona fide* and fairly allotted alike to each race, if, because a greater number of one race seeks transportation upon the carrier than may be then fully accommodated in the space allotted their race, one has to stand and thus to undergo a minor inconvenience not then incurred by others.

The order of the Commission is affirmed.

*Affirmed.*

SPRATLEY, J., dissenting.

I would hold, under the facts in this case, that Everett Raney, a Negro, was, because of his color, discriminated against in "the quality or convenience of the accommodations" afforded him. I would, however, uphold the validity of Virginia Code, 1950, sections 56-326 to 56-330, inclusive, Acts 1930, chapter 128, page 343.

The question of discrimination, it seems to me, is the principal and controlling issue. Raney does not contend that the statute is invalid. He says that, as construed and enforced by the motor vehicle carrier, it contravenes the provisions of the Federal Constitution. If he was denied the privileges and immunities of a citizen, the validity of the Virginia statute is immaterial. Regardless of the provisions of the statute, his rights are guaranteed under the Fourteenth Amendment to the Constitution of the United States.

In ordinary and common acceptation, the word "discrimination" has the meaning ascribed to it in Webster's International Dictionary, Second Edition: "A difference in treatment made between persons, localities or classes of traffic in respect of substantially the same service."

In *Davis* v. *Commonwealth*, 182 Va. 760, at page 765, 30 S. E. (2d) 700, 703, Mr. Justice Eggleston, speaking for this Court, said:

"It is necessary to the validity of segregation statutes that there be no discrimination either in their terms or in their enforcement. There must be 'substantial equality of treatment' as well as substantial equality of facilities furnished. *McCabe* v. *Atchison, etc., R. Co.,* 235 U. S. 151, 161, 162, 35 S. Ct. 69, 71, 59 L. ed. 169. A statute which permits *inequality of treatment to*

*the members* of the two races would be plainly invalid. (Emphasis added.)

"It is patent that the draftsman of the present Act appreciated this fundamental principle. Section 2 of the Act (Michie's Code of 1942, section 4097aa) (now Code 1950, sec. 56-327), expressly provides that carriers 'shall make no difference or discrimination in the quality or convenience of the accommodations provided for the two races.' "

In *New* v. *Atlantic Greyhound Lines,* 186 Va. 726, 43 S. E. (2d) 872, a colored passenger was not denied a seat on a motor bus. She refused to move to a seat equal in accommodation to the one she occupied. We held that, under the facts, there was no discrimination in the quality of the accommodations provided for her by the carrier, and upheld the validity of the statute.

Recent decisions of the Supreme Court and of the lower Federal courts point out the approach to a solution of our problem. It is true they were decided on the issue whether certain segregation statutes and carrier regulations unlawfully burdened interstate commerce. The issue was a convenient and expedient ground for disposition of the problem presented. The basis of the burden was the discrimination practiced or required to be practiced by the carrier. Yet the standard of conduct in the treatment of passengers was under consideration, and the courts expressed their views on the subject in no uncertain language.

In *Mitchell* v. *United States,* 313 U. S. 80, 61 S. Ct. 873, 85 L. ed. 1201, a Negro passenger, in interstate traffic, holding a first-class ticket, was denied a Pullman seat, although such a seat was unoccupied and would have been available to him if he had been white. Mr. Chief Justice Hughes, in delivering the opinion of the court said, "That there was but a single incident was not a justification of the treatment of the appellant."

He further said that the constitutional right of equality of treatment cannot be made to *"depend on the number of persons who may be discriminated against, because the essence of the right is a personal one."* (Emphasis added). Said he: "It is the individual who is entitled to the equal protection of the laws,—not merely a group of individuals or a body of persons according to their numbers."

In *Henderson* v. *United States,* 339 U. S. 816, 70 S. Ct. 843, decided June 5, 1950, the plaintiff, a colored passenger, was ex-

cluded from certain tables reserved for white passengers in a dining car, and forced to wait until seats at other tables reserved for Negroes were available before he was served. Said the Court:

"*The right to be free from unreasonable discrimination belongs, under section 3 (1) (Interstate Commerce Act, 49 U. S. C. A.) to each particular person. Where a dining car is available to passengers holding tickets entitling them to use it, each such passenger is equally entitled to its facilities in accordance with reasonable regulations. The denial of dining service to any such passenger by the rules before us subjects him to a prohibited disadvantage.* Under the rules, only four Negro passengers may be served at one time and then only at the table reserved for Negroes. Other Negroes who present themselves are compelled to await a vacancy at that table, although there may be many vacancies elsewhere in the diner. The railroad, thus, refuses to extend to those passengers the use of its existing and unoccupied facilities. The rules impose a like deprivation upon white passengers whenever more than 40 of them seek to be served at the same time and the table reserved for Negroes is vacant. * * *

"*It is argued that the limited demand for dining-car facilities by Negro passengers justifies the regulations. But it is no answer to the particular passenger who is denied service at an unoccupied place in the dining-car that, on the average, persons like him are served.* * * *

"That the regulations may impose on white passengers, in proportion to their numbers, disadvantages similar to those imposed on Negro passengers is not an answer to the requirements of section 3 (1). *Discriminations that operate to the disadvantage of the two groups are not the less to be condemned because their impact is broader than if only one were affected.* Cf. *Shelley* v. *Kraemer,* 334 U. S. 1, 22, 68 S. Ct. 836, 846, 92 L. ed. 1161, 3 A. L. R. (2d) 441." (Emphasis added.)

In *Chance* v. *Lambeth,* 4th Cir., 186 F. (2d) 879, it was held that the regulation of a railroad company which permitted white and colored passengers to ride in the same railroad car in part of their interstate journey through Virginia, and required separation of white and colored races, and change of cars, if necessary, when a specified city in Virginia was reached, unlawfully burdened interstate commerce. In discussing the effect of State segregation statutes and carrier regulations, and referring to *Mitchell* v. *United States, supra,* and *Henderson* v. *United States, supra,* the court said:

"In the last mentioned cases the court did not reach certain constitutional questions suggested by the complainant, but in all the cases, whether the decision was based upon a violation of a provision of the constitution or of a statute of the United States, the problem under consideration was the standard of conduct to be observed by interstate carriers in dealing with members of the traveling public. Moreover, *the ill effect upon the passengers and the disturbance of interstate traffic were much the same whether the carrier's conduct was treated technically as a denial of equal privileges to the races or as a burden upon the interstate commerce.*" (Emphasis added)

In the recent case of *Briggs* v. *Elliott*, 98 F. Supp. 529, it was held that the question of segregation of the races in public schools is a matter of legislative policy for the several states, so long as the two races are given equal facilities and opportunities. The principle of non-discrimination in statutes and regulations relating to segregation was re-affirmed.

The facts in the cases of *Mitchell* v. *United States, supra,* and *Henderson* v. *United States, supra,* fit in fairly closely with those here. What was said appears to answer the majority in this case. In the first, a Negro was denied an unoccupied Pullman seat because of his race and color. The single incident was held not a justification for his treatment. In the second, a Negro was denied an unoccupied dining car seat by reason of his color. That discrimination was condemned, although it operated to the disadvantage of a white person as well.

I am unable to see any difference in discrimination between the refusal on account of color to allow a passenger to occupy a vacant seat on a bench of a motor vehicle, partly occupied by a person of a different race, and the refusal to allow him to use a vacant seat at a table on a dining car at which persons of a different race are seated, or an unoccupied seat in a Pullman car reserved for persons of a different color. The failure to give "substantial equality of treatment" or to provide "substantial equality of facilities" in interstate commerce can hardly be different, in any degree, from like discrimination in intrastate travel. The ill effect upon a passenger is much the same in either case. Discrimination is forbidden in interstate commerce because it imposes an unlawful burden on that commerce. Inequality of treatment is also prohibited by statute in Virginia, regardless of the type of travel.

The carrier refused to extend to Raney, a Negro, the use of an existing and unoccupied seat on a bench partly occupied by a white person. He was required to stand in the aisle, all other seats being filled. If he had been a white man, he would have been permitted to take the unoccupied seat. If his mother had accompanied him on the bus, holding a ticket for transportation to North Carolina, a few miles from Norfolk, she could have occupied the seat. The "quality and convenience of accommodation" provided by the carrier bear no relation to the color or race of its passengers. Passengers on the same vehicle paying the same rate of fare are entitled to receive "substantial equality of facilities."

Seats are provided because of the desirability for comfort, convenience and safety. A standing position in the aisle of a bus, subject to its starting, moving and stopping movements can hardly be said to be substantially equal in convenience and accommodation to the occupancy of a seat. To require a passenger to stand in the aisle while there is an unoccupied seat is akin to pinning a badge of undesirability on him.

We do not have here a question of transportation. Raney was not denied the right to ride on the bus. The question is whether the refusal to extend to him the use of an existing and unoccupied facility denied to him convenience and accommodation substantially equal to that furnished other passengers. That he received a difference in treatment between passengers in such respect I have already pointed out. I can find no reason for the distinction, save that based on the color of his skin, aided by a misconstruction of the segregation statute involved.

The question of the meaning of the 1930 Act presents some difficulty. The majority of the justices solve the problem by relying upon the simple proviso: "but no contiguous seats on the same bench shall be occupied by white and colored passengers at the same time." They give no consideration to another provision of the Act which expressly prohibits discrimination. In support of their conclusion, they say that the language of the proviso is so clear and unambiguous as to need no interpretation. They ignore the conflicting provision expressly prohibiting discrimination, which constitutes the entire second section of the Act, now Code, 1950, section 56-327.

Non-discrimination in segregation statutes is essential to their validity. The quoted proviso, considered alone, is clear

and unequivocal; but, it seems to me, that when read in connection with other sections of the same Act, as it should be, it is in conflict with the express prohibition against discrimination contained in the second section, an essential requirement for the validity of the statute. Because of that conflict, an interpretation of the Act is required, with the view of effecting its presumptive validity, under established principles.

In the interpretation of the statute, we should consider all of the provisions of the Act, the object and purpose to be accomplished, and construe it with reference to its spirit and reason, and that consideration should include its historical background, the circumstances of its enactment and all other statutes *in pari materia.*

The prohibition against discrimination in segregation statutes is not a recent concept. Non-discrimination goes to the heart of the legislation and affects its very vitality. It has long been settled that a State may prescribe reasonable regulations for the segregation of white and colored passengers in intrastate traffic, if equal convenience and accommodations are furnished to the several races. Segregation, under these conditions, is the public policy of the State to promote the comfort of the passengers and preserve public peace and good order. That this is true is evident from a consideration of the enactment of segregation acts in Virginia.

In "An Act concerning public service corporations," Acts 1902-3-4, page 968, there are provisions relating to the segregation of white and colored passengers by railroad companies, chapter 4, section 28, *et seq.,* page 987; electric railway companies, chapter 4, section 41, *et seq.,* page 990; and steamship companies, chapter 6, section 1, *et seq.,* page 996. See Virginia Code, 1950, sections 56-396, *et seq.,* 56-390, *et seq.,* and 56-452, *et seq.,* respectively. In each instance it is specifically provided that the carrier shall "make no difference or discrimination in the quality and convenience of the accommodations provided for the two races." Acts 1902-3-4, chapter 4, sections 29 and 42, and chapter 6, section 1. See Virginia Code, 1950, sections 56-397, 56-391 and 56-452.

In 1906, section 43 of chapter 4 of the Act of 1902-3-4, relating to the separation of white and colored passengers on cars operated by electricity, was amended. Acts of 1906, chapter 91, page 93. There was added to section 43 this provision:

" * * * provided, however, *no contiguous seats on the same bench shall be occupied by white and colored passengers at the same time (unless or until all of the other seats in said car shall be occupied)*; * * *." (Emphasis added).

The above italicized provision is now contained in section 56-392 of Code of 1950, relating to electric railway companies.

With the successful advent of motor transportation, motor carriers superseded electric railway companies. Consequently, in 1930 the General Assembly enacted the statute under review. Acts 1930, chapter 128, page 343. The first section of this Act provided for the separation of white and colored passengers in passenger motor vehicle carriers within the State. Code of Virginia, 1950, section 56-326.

The second section, now Code, section 56-327, is identical in purpose and effect with the section forbidding discrimination by electric railway companies, (Code, section 56-397), and reads as follows:

"The motor carriers subject to the preceding section shall make no difference or discrimination in the quality or convenience of the accommodations provided for the two races under the provisions of the preceding section."

The third section, now Code, section 56-328, reads as follows:

"The driver, operator or other person in charge of any motor vehicle of a motor carrier of passengers shall, at any time when it may be necessary or proper for the comfort and convenience of passengers so to do, change the designation so as to increase or decrease the amount of space or seats set apart for either race; but no contiguous seats on the same bench shall be occupied by white and colored passengers at the same time; and such driver, operator or other person in charge of the vehicle may require any passenger to change his or her seat as may be necessary or proper. * * * "

It will be noted that, save as to classification of carrier and the omission of the qualification clause, "(but unless or until all of the other seats in said car shall be occupied)," the language of the third section of the Act of 1930 is the same as that of section 43 of Act of 1906, (Code of 1950, section 56-392), relating to electric street railway companies.

The principal differences in the character of transportation of passengers by motor carriers and that provided by electric railway companies is in the motive power employed and the

territory served. In some communities, both classes of carriers operate side by side. They supplement each other in the same business. Formerly, in Richmond an electric railway operated in the middle of the street and a motor carrier on one side of the same street. There is little or no difference in the capacity of the vehicles or their seating arrangements for passengers. The same conditions and reasons which necessitated the segregation of white and colored passengers exist in the case of each carrier. The same identical provision for non-discrimination is found in the statutes relating to each carrier.

There is the presumption that the legislature in adopting segregation statutes did not intend to violate the Constitution of this State or the United States. This is manifested by the language of the statutes expressly prohibiting discrimination. That the legislature was keenly aware of the necessity for inhibition of discrimination is emphasized by the 1906 amendment of section 43 of chapter 4 of the 1902-3-4 Act, relating to electric railway carriers.

Indubitably, the several cited Acts relate to the same subject matter and are *in pari materia*. They should be read and construed together as if they formed part of the same statute and were enacted at the same time. If there be a discrepancy or disagreement between Acts or between the provisions of an Act, so that an Act is susceptible of two constructions, one of which would make it invalid as in violation of the Constitution, and the other give validity to it, the latter interpretation should be adopted, upon the theory of legislative intent not to violate any constitutional provisions.

The non-discrimination section of the 1930 Act (Code, section 56-327) is in positive language. It can not well be ignored. Its positive inhibition should outweigh the effect to be given to a single isolated clause in contradiction thereof. Otherwise, the requirement for discrimination would be violative of the Federal Constitution.

Therefore, in view of the history of the legislation and the requirements for its validity, it seems to me that the intention of the legislature was to require that motor carriers separate white and colored passengers in their vehicles, as far as possible, without "difference or discrimination in the quality or convenience of the accommodations provided for the two races." It can hardly be thought that the legislature intended to prescribe

a different course of treatment of passengers upon two classes of transportation so closely related to each other.

It is true that the settled public policy of this State, as expressed by its statutes, is to provide for the segregation of white and colored passengers on common carriers; but inherent in all of the legislation is the proviso that there "shall be no difference or discrimination in the quality or convenience of the accommodations provided for the two races."

It is no answer to a particular passenger who is denied an unoccupied seat on a bench in a bus to say that the inconvenience suffered by him is rarely imposed on a person like him, *Mitchell* v. *United States, supra,* nor that the right or privilege denied him was due to circumstances applied alike to all. *Henderson* v. *United States, supra.* I, therefore, hold to the view that Raney, as an individual, is entitled to the full and equal protection of the law of the land.